GUSTAVE R. WOLF ET AL., APPELLANTS, v. CITY OF OMAHA, A MUNICIPAL CORPORATION, APPELLEE.

129 N. W. 2d 501

Filed July 10, 1964. No. 35649.

Hilmes & Woodruff, for appellants.

Herbert M. Fitle, Bernard E. Vinardi, Irving B. Epstein, Edward M. Stein, Sebastian J. Todero, Frederick S. Geihs, and Walter J. Matejka, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action brought in the district court for Douglas County by Gustave R. Wolf and Esther E. Wolf, husband and wife, for themselves and others similarly situated, seeking a temporary and permanent injunction to enjoin the City of Omaha, a municipal corporation, defendant, from enforcing the provisions of section 55.50.050 of the Omaha municipal code, as amended by ordinance No. 21611 of the city of Omaha.

The trial court found generally in favor of the defendant and against the plaintiffs; that ordinance No. 21611 of the city of Omaha passed by the city council on February 7, 1961, and approved by the mayor of the city on February 9, 1961, the same being section 55.50.050 of the Omaha municipal code, was valid and constitutional; that the plaintiffs were not entitled to a

permanent injunction preventing its enforcement; and that the restraining order issued in this action be dissolved.

The plaintiffs filed a motion for new trial which was overruled, and the plaintiffs appealed.

The plaintiffs are residents of the city of Omaha, a municipal corporation of the metropolitan class, organized and existing under and by virtue of the Constitution and laws of the State of Nebraska.

The plaintiffs alleged in their petition that this is a class action brought by the plaintiffs in their behalf and in behalf of others similarly situated with respect to the subject matter of this action; that the plaintiffs for many years have bred and raised purebred dogs at their home and upon the premises owned by them; that when the defendant enacted an ordinance defining a dog kennel, and exempting one or two dogs owned by a single owner from the provisions of such ordinance, the plaintiffs, upon the advice of city officials, secured a license from the city of Omaha, paying the prescribed fees therefor, which license entitled them to continue breeding and raising purebred dogs; that the plaintiffs' acts constitute a nonconforming use; that the plaintiffs were in operation and licensed for such breeding and raising of purebred dogs prior to the enactment of any regulating and prohibiting ordinance by the defendant; and that the Legislature, under the provisions of Chapter 14, article 4, of the statutes, which act is controlling of the zoning regulations of the defendant, in 1925 enacted what is now section 14-406, R. R. S. 1943. The plaintiffs' petition then sets forth the ordinances, the statutes, and the zoning regulations, their passage and dates pertinent to the instant case, and what such instruments disclosed. The plaintiffs further alleged that section 55.50.050 of the Omaha municipal code is unreasonable, arbitrary, discriminatory, and illegal because it violates the Fourteenth Amendment to the Constitution of the United States and Article I, sections 1 and 3, of the Constitution

of the State of Nebraska, and other reasons. The plaintiffs' petition prayed that the court declare section 55.50.050 of the city code to be illegal, invalid, and unconstitutional, and for a permanent injunction prohibiting the enforcement of section 55.50.050 of the city code.

The defendant, by answer, denied all allegations of the plaintiffs' petition not admitted, and alleged that Chapter 14, article 4, R. R. S. 1943, delegates the powers to cities of the metropolitan class to zone and provide for location and use of buildings, structures, and land for the residents or other purposes. The answer then set forth the history of the ordinances here involved, and alleged that the city had the power delegated to it by the Legislature and by its police power to zone and regulate dog kennels such as owned by the plaintiffs herein, and prayed that the plaintiffs' petition be dismissed.

An exhibit in evidence is a stipulation that the ordinances and sections thereof enacted by the city council of the defendant, the dates of enactment thereof, and the periods said ordinances and sections thereof are alleged to be in force and effect are admitted to be true and correct, and that the same be considered as being correct without further introduction of evidence.

The original home rule charter adopted by the city of Omaha, and which was in effect until 1956, was adopted July 18, 1922, pursuant to Article XI, section 5, of the Constitution of Nebraska. See Belitz v. City of Omaha, 172 Neb. 36, 108 N. W. 2d 421. In 1956, by vote of the electors, the city of Omaha adopted the home rule charter of 1956, which charter is now in effect. See Mollner v. City of Omaha, 169 Neb. 44, 98 N. W. 2d 33.

The home rule charter of 1922, in effect until 1956, included the following provisions setting forth the grant of power by statute to the city of Omaha to enact zoning regulations.

As a background, the following relate to the history of the subject matter here involved.

Section 14-401, R. R. S. 1943, provides: "For the purpose of promoting the health, safety, morals or the general welfare of the community, the city council in a city of the metropolitan class is hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes. Such regulations may provide that a board of appeals may determine and vary their application in harmony with their general purpose and intent, and in accordance with general or specific rules therein contained."

Section 14-402, R. R. S. 1943, provides: "For any or all of said purposes the city council may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of sections 14-401 to 14-418. Within such districts it may regulate, restrict or prohibit the erection, construction, reconstruction, alteration or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts."

Section 14-406, R. R. S. 1943, provides: "The lawful use of land existing on April 1, 1925, although such use does not conform to the provisions hereof, may be continued, but if such nonconforming use is abandoned, any future use of said premises shall be in conformity with the provisions of sections 14-401 to 14-418. The lawful use of a building existing on April 1, 1925, may be continued, although such use does not conform with the provisions hereof, and such use may be extended throughout the building, provided no structural alterations; except those required by law or ordinance are

made therein. If no structural alterations are made, a nonconforming use of a building may be changed to another nonconforming use of the same or a higher classification. Whenever a use district shall be changed, any then existing nonconforming use in such changed district may be continued or changed to a use permitted in that district, provided all other regulations governing the new use are complied with. Whenever a nonconforming use of a building has been changed to a more restricted use or to a conforming use such use shall not thereafter be changed to a less restricted use."

Section 14-403, R. R. S. 1943, provides: "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements, and to promote convenience of access. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality."

An exhibit relating to chapter 55.50, nonconforming uses, section 55.50.010, provides: "The provisions of Section 14-406, Revised Statutes of Nebraska, 1943, and any amendments which may be made thereto, relating to Non-Conforming Uses, shall be applicable to all of the provisions of this Title and any amendments thereto. (Ord. 15239 § XXI part; February 13, 1945)."

Section 55.50.020 provides: "In addition to said Section 14-406, Revised Statute of Nebraska, 1943, and any amendments thereto, the following provisions shall be

applicable to non-conforming uses. (Ord. 15239 § XXI part; February 13, 1945)."

Section 55.50.050 provides: "A dog kennel which was in non-conforming use on February 1, 1955, may remain in such use for a period up to and including February 16, 1962. Discontinuance of the non-conforming use for a period of three months will constitute an abandonment of said non-conforming use and terminate the same. (Ord. 21611 § 1; February 7, 1961)."

Ordinance No. 21611 provides: "AN ORDINANCE to amend Section 55.50.050 of the Omaha Municipal Code pertaining to Dog Kennels in non-conforming use; to repeal Section 55.50.050 of the Omaha Municipal Code as heretofore existing; and to provide the effective date hereof. * * * Section 1. That Section 55.50.050 of the Omaha Municipal Code be, and the same hereby is, amended to read as follows:

" '55.50.050 Dog Kennels. A dog kennel which was in non-conforming use on February 1, 1955 may remain in such use for a period up to and including February 16, 1962. Discontinuance of the non-conforming use for a period of three months will constitute an abandonment of said non-conforming use and terminate the same.'

"Section 2. That Section 55.50.050 of the Omaha Municipal Code as heretofore existing be, and the same hereby is, repealed.

"Section 3. That this Ordinance shall be in full force and take effect fifteen (15) days from and after the date of its passage."

Ordinance No. 18274 provides: "AN ORDINANCE to amend Section XXII, Additional Regulations, of Ordinance No. 15239, as amended, the Zone Ordinance for Omaha, Nebraska, by adding thereto a new paragraph to be numbered '13, pertaining to conditions for nonconforming uses of dog kennels. * * *

" '13. Non-Conforming Use, Dog Kennel: A dog kennel which is in non-conforming use may remain in such use for a period not to exceed five years from the

effective date of this ordinance. Discontinuance of the non-conforming use for a period of three months will constitute an abandonment of said non-conforming use and terminate the same.'" Passed February 1, 1955, and to become effective 15 days from and after its passage.

Ordinance No. 18275 is an ordinance to amend section I of ordinance No. 15239, as amended, the zone ordinance for Omaha, Nebraska, by adding thereto definitions for dog kennels and dog kennels nonconforming, and provides: "That Section I of Ordinance No. 15239, as amended, the Zone Ordinance for Omaha, Nebraska, be, and it hereby is, amended by adding thereto the following definitions:

" 'DOG KENNEL: A lot, building, structure, enclosure, or premises whereon or wherein three (3) or more dogs over four months of age are kept or maintained for any purpose whatsoever.'

" 'DOG KENNEL—NON-CONFORMING: A dog kennel used for non-commercial purposes which is located in an area other than one classified as 2nd Commercial District, or Industrial Districts, as of March 1, 1955.'" This ordinance to be in full force and take effect after 15 days from and after its passage. Passed on February 1, 1955.

Then there is a provision relating to licenses of dogs in the city of Omaha, which provisions have been complied with by the plaintiffs. This instrument also contains the regulations relating to dogs in commercial and private kennels which need not be set forth, but which plaintiffs apparently adhered to.

The Omaha municipal code, Title 55, zoning, section 55.02.50, contains the following: "DOG KENNEL, NON-CONFORMING: A dog kennel used for non-commercial purposes which is located in an area other than one classified as 2nd Commercial District, or Industrial District, as of March 1, 1955."

Section 55.50.050 provides: "Dog kennels. A dog kennel which was in non-conforming use on February 1,

1955, may remain in such use for a period up to and including February 16, 1962. Discontinuance of the nonconforming use for a period of three months will constitute an abandonment of said non-conforming use and terminate the same. (Ord. 21611 § 1; February 7, 1961)."

The home rule charter of the city of Omaha, 1956, section 7.09, Zoning Ordinance and Zoning Administration, provides in part: "The preparation, adoption, and administration of the zoning ordinance and the creation, powers, and duties of the Board of Appeals shall be as provided by the laws of the State of Nebraska."

For convenience we will refer to the City of Omaha as the city, and to Gustave R. Wolf and Esther E. Wolf, husband and wife, as plaintiffs.

The trial court, in addition to its finding and judgment, set forth in the transcript an opinion relating to this case.

The plaintiffs assign as error that in the opinion filed, the trial court erred in finding that zoning regulations enacted by the city were of local rather than statewide concern; that the statutes of the State of Nebraska conferring upon the city the power and authority to zone and regulate the use of land and buildings within its jurisdiction were of no force and effect upon the exercise of such power and authority; in finding that the city had the power and authority to terminate a lawful, valid, existing, and vested nonconforming use of real estate by zoning legislation; and in failing to grant the plaintiffs the injunctive relief prayed for against the enforcement of section 55.50.050 as heretofore set forth.

In connection with the above assignments of error, the plaintiffs set forth the following: The city, under the laws of the State of Nebraska, may regulate and restrict the use of land and buildings within its jurisdiction and in accordance with its home rule charter, subject to the grant of authority conferred upon it by the Constitution and statutes of the State of Nebraska. How-

ever, any such regulation or restriction is subject to the limitation that the same may not operate retroactively to deprive a property owner of his previously vested rights. The plaintiffs cite Chapter 14, article 4, R. R. S. 1943, particularly sections 14-401, 14-402, and 14-406; section 7.09 of the home rule charter of the Omaha municipal code, page XXXXVI; section 55.50.010 of the Omaha municipal code, as heretofore set forth; and cases from this state and some from foreign jurisdictions, relating to such subject matter.

In the case of City of Omaha v. Glissmann, 151 Neb. 895, 39 N. W. 2d 828, this court said: "A zoning ordinance may not operate retroactively to deprive a property owner of his previously vested rights, that is, a zoning ordinance cannot deprive the owner of a use to which his property was put before the enactment of the ordinance. See Cassel Realty Co. v. City of Omaha, 144 Neb. 753, 14 N. W. 2d 600.

"However, the purchase or leasing of lands with the intent to use them for a use then permissible under a zoning ordinance does not prevent the city from changing its zoning ordinance applicable thereto as such property is always held subject to the city's lawful exercise of the police power. See, West Bros. Brick Co. v. City of Alexandria, 169 Va. 271, 192 S. E. 881; 16 C. J. S., Constitutional Law, § 175, p. 541; and 11 Am. Jur., Constitutional Law, § 264, p. 1000."

In addition to the above-quoted language from the opinion, this court in City of Omaha v. Glissmann, *supra*, announced other rules applicable to the situation presented in the instant case, as follows: " 'The city of Omaha under its home rule charter has the power, by ordinance, to zone the city in the interest of public health, safety, morals and the general welfare. Any such act of the city must however not be unreasonable, discriminatory and arbitrary and it must bear some relationship to the purpose or purposes sought to be ac-

complished by the ordinance.' Cassel Realty Co. v. City of Omaha, *supra*.

"However, an ordinance passed in the exercise of such police power properly delegated to a city is presumably valid and the courts will not interfere with its enforcement until the unreasonableness or want of necessity of such measure is made to appear by satisfactory evidence. See, Union Pacific R. R. Co. v. State, 88 Neb. 247, 129 N. W. 290; Faucher v. Grosse Ile Township Building Inspector, 321 Mich. 193, 32 N. W. 2d 440; Ervin Acceptance Co. v. City of Ann Arbor, 322 Mich. 404, 34 N. W. 2d 11; Wilkins v. City of San Bernardino, 29 Cal. 2d 332, 175 P. 2d 542.

"As stated in Lombardo v. City of Dallas (Tex. Civ. App.), 47 S. W. 2d 495: 'The authorities are unanimous in holding that courts will presume that the legislative body, in enacting ordinances, acted within their authority, and the burden rests upon those who challenge their validity to show that, in the matter called in question, the action of the municipal authorities was arbitrary, unreasonable, and without substantial relation to the public safety, health, morals, or the general welfare.'

"We said in State ex rel. Krittenbrink v. Withnell, 91 Neb. 101, 135 N. W. 376, 40 L. R. A. N. S. 898:

" 'To overturn a city ordinance on the ground that it is unreasonable and arbitrary or that it invades private rights, the evidence of such facts should be clear and satisfactory.

" 'In determining the validity of a city ordinance regularly passed in the exercise of police power, the court will presume that the city council acted with full knowledge of the conditions relating to the subject of municipal legislation.

" 'In the exercise of police power delegated by the state legislature to a city, the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people,

and as to when and how such police power should be exercised.'

- "As stated in Dundee Realty Co. v. City of Omaha, 144 Neb. 448, 13 N. W. 2d 634:

" 'What is the public good as it relates to zoning ordinances affecting the use of property is, primarily, a matter lying within the discretion and determination of the municipal body to which the power and function of zoning is committed, and unless an abuse of this discretion has been clearly shown it is not the province of the court to interfere. * * *

" " 'In passing upon the validity of zoning ordinances, an appellate court should give great weight to the determination of local authorities and local courts especially familiar with local conditions.'

"Therein we cited with approval the following from Pettis v. Alpha Alpha Chapter of Phi Beta Pi, 115 Neb. 525, 213 N. W. 835: ·

- " 'The police power is inherent in the effective conduct and maintenance of government and is to be upheld, even though the regulation affects adversely property rights of some individual. City of Aurora v. Burns, 319 Ill. 84.

" ' "If considerations of public health, safety, comfort or general welfare could have justified zoning ordinance, the court must assume that they did justify it, and cannot take issue with the city council." State v. City of New Orleans, 154 La. 271.'

"In Pettis v. Alpha Alpha Chapter of Phi Beta Pi, *supra*, the court went on to say: 'The weight of judicial authority clearly appears to support the proposition that, before a zoning ordinance can be declared unconstitutional, such ordinance must be either an arbitrary or an unreasonable pronouncement of the council, or it must be without substantial relation to public health, safety, morals, or general welfare.' * * *

" 'Every intendment is in favor of the validity of the exercise of police power, and, even though a court might

differ from the determination of the legislative body, if there is a reasonable basis for the belief that the establishment of a strictly residential district has substantial relation to the public health, safety, morals or general welfare, the zoning measure will be deemed to be within the purview of the police power. * * * (Cases are cited.)

" 'What is the public good as it relates to zoning ordinances affecting the use of property is, primarily, a matter lying within the discretion and determination of the municipal body to which the power and function of zoning is committed, and, unless an abuse of this discretion has been clearly shown, it is not the province of the courts to interfere. Morgan v. City of Chicago, 370 Ill. 347; Speroni v. Board of Appeals, 368 id. 568; Michigan-Lake Building Corp. v. Hamilton, *supra;* Minkus v. Pond, 326 Ill. 467.' Zadworny v. City of Chicago, 380 Ill. 470, 44 N. E. 2d 426.

"The question of the validity or invalidity of a zoning ordinance presents a question to be determined on examination of the facts presented in each particular case."

With the foregoing in mind, the evidence discloses the following.

A licensed judge of the American Kennel Club, qualified to judge all breeds of dogs, who had been a private and public handler of dogs and in an advisory capacity concerning dogs, and who had bred dogs, testified that he was acquainted with the plaintiffs and had seen the kennel that they operate; that the plaintiffs' kennel is run as a hobby kennel, purely for enjoyment as a hobby, and is not advertised as a commercial kennel; that when the plaintiffs sell a dog they do it by indirect contact, not by advertising in the newspapers or dog publications; that plaintiffs do not have a kennel arrangement such as runs and cages; and that they have a fenced-in yard, and their dogs are not allowed to run at large. He then testified that he knew Mr. H. F. Jacobberger, another owner of dogs, and had been at his

home, and this person operates his kennel similar to the way the plaintiffs do and has his dogs fenced; that he had seen their dogs at shows and in their homes; that a good purebred dog that is a show dog is valued at from $400 to several thousands of dollars; that the people involved in this case have quality dogs; and that definitely there is no nuisance, every kennel is run as a hobby type of kennel. This witness further testified that these dogs are kept under control; that there are no offensive odors nor signs or commercial activity; that hobby breeding of dogs is fairly common around the country; that there is no mass production of dogs, but it is a technical matter where a study of bloodlines is made of the animals, and where the objective is to produce a winning dog; that that is the type of breeding such people engage in, and if they were forced to dispose of their animals they would suffer a loss financially; and that from a breeding standpoint a person cannot go into the market and buy the type of dogs that these hobby owners have. He further testified that if a stranger wanted to see the dogs he would call up and get permission to do so; and that these kennels are not run as a commercial kennel.

On cross-examination this witness testified that he would not consider a hobby kennel offensive if he lived next door to one, but that he would consider a business or commercial kennel offensive; that generally a hobby kennel is run on a small scale whereas a business-type kennel might consist of 40 or 50 dogs; that the hobby kennel owners pick up the droppings at regular intervals; and that if this was not true, it could be considered a nuisance.

On redirect examination he testified that if the owners have three dogs they may have a litter of three or four pups, but they never keep all of the pups, but probably keep the best one for themselves; that home breeders keep their dogs at a minimum because it is a hobby and not a money-making proposition; that in hobby ken-

nels the dogs are confined; and when they go for a walk they are on a leash.

On recross-examination he testified that if the owner lets the dogs bark at will, and does not pick up the droppings, or advertises and has people coming on the premises, there might be a basis for calling such a kennel a nuisance, but this condition does not exist, to the knowledge of this witness, among hobby dog owners. This witness further testified that he did not believe any person operating a hobby kennel makes a profit; and that the money put into the business to show dogs is necessary because it is expensive, and at the end of the year such hobby owners are definitely in the red.

The chief environmental health sanitarian for the city testified that his duties are anything that has to do with environment, which could be dog problems, nuisances, garbage, and trash; that his department is charged by ordinance, together with the humane society, with general supervision to correct such problems; and that he has served in such capacity since January 11, 1954. This witness further testified that with home kennels which had been inspected twice a year for 5 years, there was no problem involved, and they were not nuisances so far as his department was concerned; that the dogs were enclosed as provided by ordinance, and proper sanitary facilities and housing were provided; that the dogs were kept under shelter as they should have been; and that no complaints were made to him. He further testified that in 1961, these hobby kennels were inspected, and before the owners could obtain a license the kennels had to be inspected every year by the humane society, the planning people, and the health department; that he found nothing objectionable at the time; that the dogs in most cases were kept in a kennel with cages, but were treated more as pets; and that the kennels were hobby kennels and not business kennels. He testified to a record of the owners of dogs that operated such kennels; that there was little

variance during the years relating to the number of dogs that were kept by such owners; that the number was constant; that hobby owners might have three dogs, and with the exception of puppies, that number would remain constant; that all animals in the city are problems, such as dogs running at large, littering neighbors' yards and trespassing on flowers; and that there are also dog bites, and the problem of keeping the pens clean.

On cross-examination this witness testified that he had been with the health department since 1953, and had worked with the humane society since that time; that with reference to the ordinance drafted in 1955, it defined a kennel as having three or more adult dogs, and provided that kennels could only be located in the second commercial or industrial districts; that if a kennel was in existence in a residentially zoned district it could exist for up to 5 years; that that ordinance was passed because it was thought that kennels in a residential district would be a nuisance; that he had investigated kennels in which more than three dogs were kept and where complaints had been made; and that these complaints presented problems such as sanitation and noise, and would constitute a nuisance.

Gustave R. Wolf, one of the plaintiffs, testified that he had been breeding pug dogs approximately 12 years; that the dogs are kept in the basement of his home; that his backyard is fenced; that the dogs are in the house after hours; that during the daytime they are not allowed out unless his wife is with them; that if they hear a peep out of the dogs they are brought in; that the dogs are not permitted to run in the yard for long periods of time; that the yard is cleaned periodically, meaning picking up droppings which are not very much with small dogs; that he has received no complaints from his neighbors about odor, noise, or anything of that nature; that as far as his dogs are concerned, it is a hobby; that he is not in the business to breed as many

dogs as he can; that in the last year and a half, or possibly 2 years they had had one litter of pups, that the only reason they breed dogs is to improve the bloodlines and try to get a potential champion; that going to dog shows is expensive; that he spends money on dogs to try to get a perfect dog; that this is on a hobby basis; that people are acquainted with him and his wife because they have built up prestige by attendance at dog shows in the Midwest, and when somebody is looking for a good pug dog they think of the plaintiffs; that these dogs will be sold to people who call them and want to know if they have any dogs for sale; that as far as the sale of dogs is concerned, they had sold only one dog in the past year; that there is no traffic in dogs; that he doubted if he could replace his champion dog on the market because he is one of the outstanding dogs in the Midwest; that there are no signs, no advertising, and no invitation to the public to come and see the dogs; that if someone would call up and want to breed to their champion, the plaintiff would have to know all about the female dog, want to see her and know her bloodlines; and that they are not interested in the few dollars that could be received as a stud fee.

On cross-examination this witness testified that he lives in a fifth residential district and has three adult dogs; that with only two dogs plaintiffs would be unable to pursue this hobby and retain the bloodlines necessary to develop the quality dogs; that each dog has a cage which is kept in the basement; that the dogs bark very little; and that a kennel is not offensive if it is kept clean and free from noise.

The chief environmental health sanitarian of the city testified for the city that there had been situations in the city where three or more dogs had created a problem in quite a number of cases, and in most cases they had constituted a nuisance, usually a noise nuisance, and in a number of cases had created a sanitary nuisance. When the owners do not pick up after the dogs, such

problems have been offensive to the public health, safety, and public welfare. There are cases where persons have three dogs and where complaints were lodged, and the department reduces their number of dogs to two. By sanitation this witness meant when the owners of dogs do not pick up their droppings for some period of time until they are forced to, then odor and fly problems exist. This condition constitutes a health hazard and a nuisance within the ordinance under the health department of the city.

The city planning director since 1956 testified that he was the administrative officer of the planning department which is charged with the responsibility of preparing and keeping up-to-date the master plan for the city, for the administration of the subdivision regulations, and for the administration of amendments to the zoning ordinance of the city; that based upon his experience as a planning director and having worked in this field, he gave as his opinion that he believed that dog kennels should be located in the rural areas surrounding the city, in the areas which are not developed into suburban residential neighborhoods yet but are on the fringe of the city; and that in his opinion dog kennels should not be located in residential districts because in the past there had been certain features about the operation of kennels which in his opinion were incompatible with the normal residential areas in the following respects; in many instances dog kennels involve one or more outbuildings located in the rear of property, and often involve high fences around runs, and this type of outbuilding construction is not typical of modern residential subdivisions and residential neighborhoods; that there is a psychological element which affects neighbors; in some cases small children, and in some cases older people, either have a fear or distaste for groups of dogs; sometimes there has been a noise in connection with kennels and in some instances odors; and that these things all taken together are a special type of ac-

tivity which is not in keeping with the normal single-family residence on a normal lot in a residential neighborhood. He was asked if he had not expressed himself as being satisfied that the home kennels could be taken care of in the draft of the proposed ordinance. He replied: "I don't want to say something that I might—I can't remember exactly. This entire matter was discussed over a period of 12 to 18 months, as I remember it, and I believe we thought this was a compromise with the kennel people and what we thought the Planning Board and the staff could recommend. I believe when I say it was a compromise that I am accurate. I don't believe I enforced it a thousand per cent, but I believe we did agree that this could be set up for hearing and sent to the council." He further testified that this was a compromise; that there were a number of changes on all sides as to the number of dogs and all the rest of it; and that it was put through a public hearing in the council. In response to a question by the court, this witness said that he would not make a distinction between so-called commercial kennels and the so-called hobby kennels or private kennels. He was asked what happens if these kennels are located in an undeveloped area adjacent to a metropolitan area such as Omaha and the city expands and neighbors move in. His answer was: "We tried to anticipate that a little bit by requiring a large tract of ground, I don't recall the exact size, but getting into an acreage size tract of ground which would have extremely wide yards between any possible kennel buildings and the neighbors, so that if the city grew up to it at least the abutting lots would be—I don't recall the size, 85, probably a hundred feet from any kennel properties, and when people move up next to an operation like that they do so knowingly, and if they mind a kennel they don't need to live next to it, and you are not superimposing something on somebody that they may not enjoy."

The plaintiffs also rely on the case of City of Omaha

v. Gsantner, 162 Neb. 839, 77 N. W. 2d 663, wherein the plaintiffs contend this court ruled indirectly upon the question of a nonconforming use. This was an injunction action wherein the plaintiff sought an injunction prohibiting the defendant from operating a dog kennel on described property. The defendant admitted the operation of such kennel and contended that it was a nonconforming use within the meaning of section 14-406, R. R. S. 1943. The trial court dismissed the city's petition. We reversed the judgment. The property of the defendant was within half a mile of a designated residential district. Section 14-406, R. R. S. 1943, was set forth in part, as has been previously set forth herein. This court said: "For defendant to come within the permitted nonconforming use provisions of the statute, it is necessary that three things be established: (1) That the use made of the premises prior to the adoption of the ordinance was a commercial livestock farm operation; (2) that the use for which the premises are now used is a commercial livestock farm operation; and (3) that the two uses are of the same classification or that the dog kennel use is of a higher classification."

The plaintiffs' contention is that the above statement by this court laid down the test for determining what is and what is not a valid nonconforming use, and established that such uses were lawful and could be continued within the bounds of the statute and this interpretation. The court further said: "Defendant seeks to change a conforming use to a nonconforming use. The ordinance prohibits it."

The plaintiffs assert that ordinance No. 15239 of the city, commonly known as the comprehensive zoning act, was adopted February 13, 1948, and included as a part thereof section 14-406, R. R. S. 1943, which appears, as heretofore set out, as section 55.50.010. The plaintiffs assert that the reason for setting the foregoing out is that the city, to zone and regulate within its jurisdiction

is dependent upon and subject to the grant to it by the Legislature of such power and authority, and to point up the fact that both charters and the applicable ordinances of the city have incorporated therein and subjected zoning regulations to the legislative grant and the specific prohibition set forth in section 14-406, R. R. S. 1943; that this latter prohibition in both statute and local regulation protects vested nonconforming uses of property in the city from interference or abolishment under the guise of zoning regulations; and that the licensees in the instant case enjoyed a vested property right which the city seeks to abridge by the cited legislative action.

The above-cited case presents an entirely different situation than appears in the instant case. Section 14-406, R. R. S. 1943, is not the only section involved in this case as heretofore indicated.

The plaintiffs' second proposition relates to the police power of the city with reference to the subject matter here involved. The law with reference thereto, insofar as this state has announced it, appears above.

The foregoing constitutes the contentions of the plaintiffs in the instant case.

We now turn our attention to the contention of the city.

No case seems to have been decided in this state squarely involving the precise question presented.

There is a decided lack of accord as to the power to terminate a lawful nonconforming use existing at the time a zoning ordinance was passed, after use has been permitted to continue. In several cases the validity of such a requirement has been upheld.

In the case of City of Los Angeles v. Gage, 127 Cal. App. 2d 442, 274 P. 2d 34, the defendant was in the plumbing supply business which was located in a fourth residential multiple-dwelling zone. Defendant's business produced a gross revenue varying from $125,000 to $350,000 a year. Defendant claimed, and the lower

court found, that he had obtained vested rights to continue in the location. The City of Los Angeles contended that the mandatory discontinuance of a nonconforming use after a fixed period was a reasonable exercise of the police power. The court said: "There is a growing tendency to guard against the indefinite continuance of nonconforming uses by providing for their liquidation within a prescribed period. * * * It was not and is not contemplated that pre-existing nonconforming uses are to be perpetual. (State ex rel. Miller v. Cain, 40 Wn.2d 216 [242 P. 2d 505]). The presence of any nonconforming use endangers the benefits to be derived from a comprehensive zoning plan. Having the undoubted power to establish residential districts, the legislative body has the power to make such classification really effective by adopting such reasonable regulations as would be conducive to the welfare, health, and safety of those desiring to live in such district and enjoy the benefits thereof. * * * It would seem to be the logical and reasonable method of approach to place a time limit upon the continuance of existing nonconforming uses, * * * based on the nature of the use; * * *.

"Exercise of the police power frequently impairs rights in property because the exercise of those rights is detrimental to the public interest. Every zoning ordinance effects some impairment of vested rights either by restricting prospective uses or by prohibiting the continuation of existing uses, because it affects property already owned by individuals at the time of its enactment." The court further said: "A business which, when established, was entirely unobjectionable may, by growth or change in character of neighborhood, become a source of danger to public health, morals, safety or general welfare of those who have come to be occupants of surrounding territory, and may thus become subject to municipal regulation or prohibition." The court further said: "Whether zoning ordinance is unreasonable, arbitrary and discriminatory is related to its application to

particular property involved, and each case must be determined on its own facts. * * * A zoning ordinance may be amended from time to time as new and changing conditions warrant revision. * * * Public welfare must be considered from standpoint of objective of zoning and of all property within any particular use district, and it is not contemplated that preexisting nonconforming uses are to be perpetual." The judgment was reversed.

In State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613, the defendants had used their property as a retail grocery store for a great many years prior to 1927. In 1927 the city passed a zoning ordinance which established the area in which the property was located as a residential district and provided that all businesses then in operation within that area should be liquidated within 1 year from the passage of the ordinance. It was contended that this provision was unconstitutional as being arbitrary and unreasonable, and that it amounted to a taking of the defendants' property without due process of law. After referring to, and quoting at some length from, Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, the first case in which the Supreme Court of the United States considered and upheld the validity of a zoning ordinance, the court stated: "It is to be observed, too, that the ordinance there under consideration provided for the establishment and maintenance of residential districts from which every kind of business was excluded. The ordinance did not deal specially with any already established business in the zoned district. But, if the village had the authority to create and to maintain a purely residential district, which the court held it did have, and if such an ordinance was not arbitrary and unreasonable, it follows necessarily that the village was vested with authority to remove any business or trade from the district and to fix a limit of time in which the

same shall be done." The Supreme Court of the United States denied certiorari. 280 U. S. 556, 50 S. Ct. 16, 74 L. Ed. 612.

In State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752, 123 So. 314, the validity of a zoning ordinance of New Orleans was attacked. The ordinance prohibited any business establishment from operating within a prescribed area, and gave all businesses in operation at the time 1 year in which to liquidate. The defendant had operated a small retail drugstore on her property for some time prior to the passage of the ordinance. She disregarded the ordinance. The court said: "It is also suggested that the ordinance is unconstitutional, because it grants only one year to liquidate and close an established business in the district. Defendant's drug store is a small one, and it is obvious that one year affords ample time within which to liquidate the business and close it. The validity of that provision of the ordinance was decided unfavorably to defendant's contention in State ex rel. Dema Realty Co. v. McDonald, *supra*. (168 La. 172, 121 So. 613.)"

In In re Harbison v. City of Buffalo, 4 N. Y. 2d 553, 152 N. E. 2d 42, many cases are cited where decisions have sustained ordinances where the time provided was held reasonable. See, Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal. 2d 121, 272 P. 2d 4; Standard Oil Co v. City of Tallahassee, 183 F. 2d 410, certiorari denied 340 U. S. 892, 71 S. Ct. 208, 95 L. Ed. 647; Spurgeon v. Board of Commissioners of Shawnee County, 181 Kan. 1008, 317 P. 2d 798; Grant v. Mayor & City Council of Baltimore, 212 Md. 301, 129 A. 2d 363; Robinson Brick Co. v. Luthi, 115 Colo. 106, 169 P. 2d 171, 166 A. L. R. 655; City of Corpus Christi v. Allen, 152 Tex. 137, 254 S. W. 2d 759; Stoner McCray System v. City of Des Moines, 247 Iowa 1313, 78 N. W. 2d 843, 58 A. L. R. 2d 1304; United Adv. Corp. v. Borough of Raritan, 11 N. J. 144, 93 A. 2d 362.

A number of states and municipal bodies have adopted

statutes authorizing this approach to the problem. See 8 McQuillin on Municipal Corporations (3d ed.), § 25.190, p. 489. Cities that have progressed such ordinances are Chicago, Illinois; Cleveland, Ohio; New Orleans, Louisiana; Richmond, Virginia; Seattle, Washington; Wichita, Kansas; and Tallahassee, Florida.

In Spurgeon v. Board of Commissioners of Shawnee County, *supra*, the court cited cases wherein the constitutionality of such an ordinance was challenged on the ground that it violated the Fourteenth Amendment and was confiscatory, and then said that the constitutionality of zoning laws had long been a settled question as far as the Fourteenth Amendment is concerned. The Fourteenth Amendment to the Constitution of the United States does not impair the police power of a municipality. See Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923.

The general principle has been established in many cases that in the event of a conflict between a state statute and a city ordinance, the state statute will prevail if the matter is one of statewide concern, but that on the contrary the city ordinance will prevail if the matter is one of purely local concern, or one which only indirectly or remotely affects the people of the state outside the particular municipality. We do not believe that in the instant case there is any problem involving a conflict between a state statute and a city ordinance, notwithstanding the fact that section 14-406, R. R. S. 1943, is incorporated in the Omaha comprehensive zoning code. The zoning here involved is a matter of local concern rather than statewide concern.

We conclude, from the evidence in the record, that the city council did not act in an arbitrary and unreasonable manner, or in a discriminatory manner, but did take into consideration the interests and general welfare of the public with respect to public health, safety, and morals.

We find that section 55.50.050 of the city code is not

unreasonable, discriminatory, or arbitrary, and bears relationship to the purpose sought to be accomplished; and that 7 years is ample time for plaintiffs to amortize and minimize their losses, if any. The subject matter of this action is a matter of local concern and not a matter of statewide concern. No provision of the United States Constitution or the Constitution of the State of Nebraska has been violated, as contended for by the plaintiffs.

We hold the ordinance to be valid and constitutional, and a proper exercise of the police power delegated by the Legislature to the city.

We affirm the judgment of the trial court.

AFFIRMED.