Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/19/2016 09:08 AM CDT

JOHN J. MALONE, SR., APPELLANT, v.
CITY OF OMAHA, APPELLEE.
___ N.W.2d ___

Filed August 19, 2016.    No. S-15-676.

1.  **Ordinances: Appeal and Error.** Interpretation of a municipal ordinance is a question of law, on which an appellate court reaches an independent conclusion irrespective of the determination made by the court below.
2.  **Courts: Statutes: Ordinances.** When reviewing preemption claims, a court is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject.
3.  **Statutes: Appeal and Error.** The interpretation of statutes and regulations presents questions of law which an appellate court reviews de novo.
4.  **Ordinances: Presumptions: Proof.** Courts generally presume that legislative or rulemaking bodies, when enacting ordinances or rules, are acting within their authority. The burden to show otherwise rests on the party challenging the validity of the ordinance or rule.
5.  **Municipal Corporations: Ordinances.** To overturn a city ordinance on the ground that it is unreasonable and arbitrary or that it invades private rights, the evidence of such facts should be clear and satisfactory.
6.  **Municipal Corporations: Ordinances: Presumptions.** In determining the validity of a city ordinance regularly passed in the exercise of police power, the court will presume that the city council acted with full knowledge of the conditions relating to the subject of municipal legislation.
7.  **Municipal Corporations: Legislature.** In the exercise of police power delegated by the state Legislature to a city, the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people and as to when and how such police power should be exercised.

8. **Legislature: Statutes: Municipal Corporations: Ordinances.** Preemption of municipal ordinances by state law is based on the fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state. Municipal laws are inferior to state law, because a municipal corporation derives all of its powers from the state and has only such powers as the Legislature has seen fit to grant to it; as such, in the case of a direct conflict between a statute and a city ordinance, the statute is the superior law.

9. **Statutes: Legislature: Intent.** There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. In all three cases, the touchstone of preemption analysis is legislative intent.

10. **Political Subdivisions: Statutes: Legislature: Intent.** Express preemption occurs when the Legislature has expressly declared in explicit statutory language its intent to preempt local laws.

11. \_\_\_\_: \_\_\_\_: \_\_\_\_: \_\_\_\_. Field preemption and conflict preemption arise in situations where the Legislature did not explicitly express its intent to preempt local laws, but such can be inferred from other circumstances.

12. \_\_\_\_: \_\_\_\_: \_\_\_\_: \_\_\_\_. In field preemption, legislative intent to preempt local laws is inferred from a comprehensive scheme of legislation.

13. **Statutes: Political Subdivisions.** When there is not comprehensive legislation on a subject, local laws may cover an authorized field of local laws not occupied by general laws, or may complement a field not exclusively occupied by the general laws.

14. **Political Subdivisions: Statutes: Legislature.** The mere fact that the Legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted. But where the state has occupied the field of prohibitory legislation on a particular subject, there is no room left for local laws in that area and a political subdivision lacks authority to legislate with respect to it.

15. **Political Subdivisions: Statutes: Legislature: Intent.** In conflict preemption, legislative intent to preempt local laws is inferred to the extent that a local law actually conflicts with state law.

16. **Constitutional Law.** The liberty to contract, the right to acquire and sell property in a lawful manner, and the right to conduct lawful business are constitutionally protected rights.

17. **Statutes: Constitutional Law.** A regulatory statute adopted by virtue of the police power which has no reasonable relation to the public health, safety, and welfare is invalid. The test of validity is the existence of a real and substantial relationship between the exercise of the police power and the public health, safety, and welfare.

18. ____: ____. A statute, under the guise of a police regulation, which does not tend to preserve the public health, safety, and welfare is an unconstitutional invasion of the personal and property rights of the individual.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed.

Brian J. Koenig and Eric A. Nanfito, of Koley Jessen, P.C., L.L.O., for appellant.

Alan M. Thelen, Deputy Omaha City Attorney, and Jennifer J. Taylor for appellee.

Heavican, C.J., Wright, Cassel, Stacy, and Kelch, JJ., and Inbody and Riedmann, Judges.

Heavican, C.J.

## I. INTRODUCTION

The City of Omaha (City) enacted ordinance No. 39090, which required contractors doing work within the City to obtain a license. John J. Malone, Sr., challenged the ordinance on various grounds. Most of the grounds were dismissed following the City's motion for summary judgment; the last was dismissed following a bench trial. At issue on appeal is the City's authority to enact this ordinance. We affirm.

## II. FACTUAL BACKGROUND

Ordinance No. 39090 was placed on the Omaha City Council agenda for a first reading on May 3, 2011. The original ordinance provided that it was for "the licensing and regulation of general contractors."

A second reading was on the agenda for a meeting held on May 10, 2011, and the public was invited to testify. Notice of this hearing was published and indicated that the ordinance concerned licensing and regulation of general contractors. In response to opposition, the ordinance was laid over and revised.

The ordinance was eventually enacted on August 16, 2011. The agenda for that meeting noted that the ordinance concerned licensing and regulation of general contractors and that amendments to the ordinance would be considered. Those amendments were eventually incorporated into the ordinance as enacted.

Generally speaking, the changes from the proposed to the adopted versions of the ordinance were (1) a change throughout of the term "general contractor" to "contractor" and (2) the removal from the definition of contractor, and thus from the reach of the ordinance, (a) "landlords and property owners performing work on property that they own but do not reside in," (b) persons performing routine maintenance and handyman services, and (c) certain organizations using a volunteer labor force. The adopted ordinance, with changes to the proposed ordinance as noted by underscores and strikethroughs, provided:

Sec. 43-273. ~~General c~~ Contractor defined.

(a) For purposes of this article, a "~~general~~ contractor" is defined as any person or entity who contracts with the owner or tenant of property to build, construct, alter, repair, add to, subtract from, or otherwise improve any building or structure upon the said property, within the city or its three-mile extraterritorial jurisdiction. ~~The term also applies to landlords and property owners performing work on property that they own but do not reside in.~~ The term "~~general~~ contractor" shall not include any of the following:

(1) ~~a~~A tradesman licensed by the city who performs work within his or her licensed trade, or any subcontractor performing work under a contract with a licensed ~~general~~ contractor.

(2) A person performing work defined as routine maintenance in section 43-72.

(3) A person performing work under the definition of "handyman services" in section 43-72.

(4) Any organization that constructs new or renovates existing structures with a mostly volunteer labor force. Such organization shall have at least one of the following: (a) at least one person on [its] staff who is a licensed contractor holding a Class "C" or above license, (b) a licensed contractor holding a Class "C" or above license serving as a board member acting as [its] license holder, or (c) a volunteer licensed contractor holding a Class "C" or above license working on the building site providing oversight and mentoring for the work crew.

On June 25, 2013, Malone filed suit challenging the ordinance. As relevant on appeal, the complaint alleged that the passage of ordinance No. 39090 did not comply with the procedural requirements of the Omaha City Charter, art. II, § 2.12 (1984); that the ordinance placed an unfair restriction on and monopolized the contracting industry in the City; and that the ordinance violated Malone's constitutional rights.

The district court granted the City's motion for summary judgment on all but one of Malone's claims. That claim, identified in the complaint as "Injuries to Business and Property," proceeded to a bench trial. Following trial, the district court found for the City, concluding that the City was within its power to enact the ordinance and that the ordinance did not prevent Malone from working on his own property.

Malone appealed. Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the case to our docket.[1]

### III. ASSIGNMENTS OF ERROR

Malone assigns, restated and consolidated, that the district court erred in (1) not finding that the ordinance was enacted in violation of § 2.12 of the City's charter; (2) finding that the City was empowered under its charter to enact the ordinance; (3) not finding that the ordinance was monopolistic and failed

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Supp. 2015).

to further the public health, safety, or welfare; (4) not finding that the ordinance was unlawful because it was preempted by the Legislature's occupation of the fields of the licensing of the health, safety, and welfare of the public, the construction industry, and the lead abatement industry; (5) finding that the ordinance did not violate Malone's constitutional right to conduct a lawful business; (6) granting the City's motion for summary judgment; and (7) not granting permanent injunction and instead dissolving the temporary injunction.

## IV. STANDARD OF REVIEW

[1] Interpretation of a municipal ordinance is a question of law, on which we reach an independent conclusion irrespective of the determination made by the court below.[2]

[2] When reviewing preemption claims, a court is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject.[3]

[3] The interpretation of statutes and regulations presents questions of law which we review de novo.[4]

## V. ANALYSIS

### 1. § 2.12

In his first assignment of error, Malone contends that the district court erred when it failed to find that the ordinance was passed in violation of § 2.12 of the City's charter.

That section provides:

> Every legislative act of the Council shall be by ordinance, and other acts, if so required by law, shall also be by ordinance. Every ordinance shall be offered in writing and signed by the elected official introducing

---

[2] *State ex rel. Parks v. Council of City of Omaha*, 277 Neb. 919, 766 N.W.2d 134 (2009).

[3] *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013).

[4] See *id.*

it. The enacting clause of every ordinance shall be as follows: "Be it ordained by the City Council of the City of Omaha:". No ordinance shall contain more than one subject, and the same shall be clearly expressed in the title. No ordinance, except emergency ordinances enacted pursuant to section 2.13, shall be passed earlier than two weeks after its introduction or go into effect before fifteen days from the time of its passage, but in the case of ordinances not of a legislative character, the Council may provide by rule for an earlier effective date. There shall be three readings of every ordinance, which may be satisfied by the title being published on the printed agenda, at separate meetings and, if not read or considered at consecutive meetings, any postponement shall be to a date certain. There shall be opportunity provided for a public hearing at the same time as the second reading unless a different time shall be fixed at the first reading. *At least three days before the public hearing, the title of the ordinance and a notice of the time and place of the public hearing shall be published at least once in the official newspaper.* Every ordinance enacted shall, not later than ten days after its effective date, be published in the official newspaper, unless the Council shall waive this requirement and in lieu thereof direct the publication of only the title and a summary of the ordinance's contents.[5]

On appeal, Malone asserts that when the City amended the title from "licensing and regulation of general contractors" to "licensing and regulation of contractors," it was required to provide notice anew of that change in order to comply with § 2.12. Malone bases this argument on his perception of the distinction between "general contractor" and "contractor."

We disagree that the City was required to recommence the notice process on these facts. As Malone notes, § 2.12

---

[5] § 2.12 (emphasis supplied).

provides that the title be published along with the public hearing information in order to provide notice that the ordinance would be discussed. There is no dispute that this notice was sufficient at the outset and that a hearing on the ordinance was held.

But the record shows that after this initial public hearing, amendments were made to the proposed ordinance in response to the feedback received at the hearing. There is nothing in § 2.12 that requires that after holding a public hearing, the notice process begins anew when changes are made to the ordinance. Indeed, the purpose behind the title is to provide notice; once it has performed that function, the title no longer serves any useful purpose.

We disagree with Malone's contention that the change widened the scope of the ordinance because "general contractor" is a narrower term than "contractor." The amendment of the term "general contractor" to "contractor" did not change the original meaning of the term as expressed in the initial draft, and in fact, the changes acted to remove certain individuals from the definition of the term "contractor."

Finally, the amendment to the ordinance's title was purely stylistic in nature as it simply changed the title to comport with the amendments to the ordinance.

We conclude that Malone's first assignment of error is without merit.

## 2. Power to License

### (a) City's Authority

Malone next argues that the City lacked the authority to pass the ordinance, because the City has no authority to license contractors. Malone makes several arguments as to why the City lacks this power: (1) The power is not granted by the City's charter, (2) case law limits the power to license, and (3) the power to license has been preempted by the Legislature. We note that there is conflicting authority regarding the nature of

the City's charter. But we need not reach Malone's argument on this point, because we conclude that, in fact, case law and Nebraska statutes support the conclusion that the Legislature has authorized the City to pass this ordinance and that the ordinance is not preempted by the Legislature. We therefore find Malone's arguments to be without merit.

[4-7] Courts generally presume that legislative or rulemaking bodies, when enacting ordinances or rules, are acting within their authority.[6] The burden to show otherwise rests on the party challenging the validity of the ordinance or rule.[7] To overturn a city ordinance on the ground that it is unreasonable and arbitrary or that it invades private rights, the evidence of such facts should be clear and satisfactory.[8] In determining the validity of a city ordinance regularly passed in the exercise of police power, the court will presume that the city council acted with full knowledge of the conditions relating to the subject of municipal legislation.[9] In the exercise of police power delegated by the state Legislature to a city, the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people and as to when and how such police power should be exercised.[10]

The Legislature has passed several different statutes empowering cities to regulate building construction. To begin, Neb. Rev. Stat. § 71-6406(1) (Supp. 2015) of the Building Construction Act provides that "[a]ny political subdivision may enact, administer, or enforce a local building or construction code if or as long as such political subdivision adopts the state building code." Both the City and the State have

---

[6] See *Smith v. City of Papillion*, 270 Neb. 607, 705 N.W.2d 584 (2005).

[7] *Id.*

[8] *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964).

[9] *Id.*

[10] *Id.*

adopted the appropriate building codes.[11] Section 71-6406(3) also allows a political subdivision, such as the City, to collect fees which monitor a builder's application of codes.

Still other relevant grants of power are enumerated in Nebraska law. Neb. Rev. Stat. § 14-102 (Supp. 2015) sets forth the powers of a city of the metropolitan class. Section 14-102(32) empowers the City "[t]o prescribe fire limits and regulate the erection of all buildings and other structures within the corporate limits . . . ." Section 14-102(33) grants the City the power "[t]o regulate the construction, use, and maintenance of party walls, to prescribe and regulate the thickness, strength, and manner of constructing stone, brick, wood, or other buildings and the size and shape of brick and other material placed therein . . . ." That subsection also allows the regulation of other specific elements of building construction, including, among others, fire escapes, elevators, plumbing, pipefitting, chimneys, fireplaces, and stairways.

> The City also has been granted the following broad powers: To make and enforce all police regulations for the good government, general welfare, health, safety, and security of the city and the citizens thereof in addition to the police powers expressly granted herein; and in the exercise of the police power, to pass all needful and proper ordinances and impose fines, forfeitures, penalties, and imprisonment at hard labor for the violation of any ordinance, and to provide for the recovery, collection, and enforcement thereof; and in default of payment to provide for confinement in the city or county prison, workhouse, or other place of confinement with or without hard labor as may be provided by ordinance.[12]

We therefore conclude that the City has the power to regulate contractors.

---

[11] Neb. Rev. Stat. § 71-6403 (Supp. 2015); Omaha Mun. Code, ch. 43, art. II, § 43-121 (2008).

[12] § 14-102(25). See, also, § 14-102(3) and (5).

Still, Malone contends that the power to regulate does not include the power to license. He cites to *State v. Wiggenjost*[13] and *Gray v. City of Omaha*[14] in support of this assertion. In *Gray*, this court held that the City of Omaha did not have the authority to license a person engaged in the occupation of installing sidewalks. And in *Wiggenjost*, we held that the city of Lincoln did not have the authority to license a sign painter.

We disagree with this assertion. These cases do not suggest that licensure may never be permitted; rather, both simply suggest that licensure on the facts of those cases did not affect the public's health, morals, safety, or welfare.

And indeed, in *State v. Phillips*,[15] we held that the city of Lincoln did have the authority to license a person engaged in the business of house moving. We noted:

> It may be stated as a broad proposition that there are some occupations which every citizen may engage in as a matter of right and which are not subject to regulation by public authorities. *Such occupations, however, as may in their performance affect public health, morals, safety or welfare are proper subjects of regulation under the police power* . . . .[16]

This raises another of Malone's assertions—that the health, safety, and welfare of the citizenry was not affected by this ordinance. Malone argues that public health, safety, and welfare would be better served if more individuals obtained permits for work done within the City's limits, because that work would then be inspected. Malone also notes that virtually all work that is inspected eventually passes that inspection and that a contractor who would not pull a permit will also not get licensed.

---

[13] See *State v. Wiggenjost*, 130 Neb. 450, 265 N.W. 422 (1936).

[14] *Gray v. City of Omaha*, 80 Neb. 526, 114 N.W. 600 (1908).

[15] *State v. Phillips*, 133 Neb. 209, 274 N.W. 459 (1937).

[16] *Id*. at 211, 274 N.W. at 460 (emphasis supplied).

Malone is correct insofar as his argument goes. But there is nothing that requires the licensing ordinance at issue here to be perfect; it just has to impact public health, safety, and welfare. And there is little doubt but that it does. A witness for the City testified that the purposes behind licensing contractors were to decrease the number of reinspections and to ensure that contractors working in the field understood what inspectors expected of them and their work. Yet another reason was to keep closer watch on the contracting community. The witness testified that those goals had been met. And more generally, one stated purpose behind requiring a building code is that such standards are necessary to "safeguard life, health, property, and the public welfare by regulating and controlling the design, construction, quality of materials, use and occupancy, and maintenance of buildings and structures within this state."[17]

The City has the authority under state law to enact such an ordinance. Malone's arguments to the contrary are without merit.

### (b) Monopoly

Malone also asserts that the ordinance is monopolistic because it is more difficult for individual and small firm contractors to obtain licensure than it is for larger contracting firms. Malone states that the court in *Gray* specifically noted that the sidewalk licensing ordinance at issue did not "'creat[e] a monopoly'" but that it was "'monopolistic in its tendency, and would incline to lessen competition.'"[18]

We disagree with Malone. The requirements for licensure are the same under the ordinance regardless of who is applying for the license, and the record shows that one licensed contractor per job is generally sufficient regardless of the number of individuals also working that same job.

---

[17] Neb. Rev. Stat. § 71-6402(2) (Reissue 2009).

[18] Brief for appellant at 32, quoting *Gray v. City of Omaha, supra* note 14.

*Gray* is inapplicable, because there the court also noted simply that even if something might be monopolistic, it might still be necessary for a city to exercise its power to regulate, for reasons of public safety.[19] And we have concluded that public safety is at issue here.

It is true that licensing contractors will not catch every instance of poor contracting work, because some contractors will simply not obtain a license, but licensure nevertheless impacts the public's health, safety, and welfare. Malone's argument to the contrary is without merit.

### (c) Legislative Preemption

Malone next argues that the district court erred in not finding that the ordinance was preempted by state law. Malone contends that contractor licensing is preempted by (1) the Building Construction Act,[20] (2) the Contractor Registration Act,[21] and (3) the Residential Lead-Based Paint Professions Practice Act.[22]

[8] "'[P]reemption of municipal ordinances by state law is based on the fundamental principle that "municipal ordinances are inferior in status and subordinate to the laws of the state."'"[23] Further, we have explained that municipal laws are inferior to state law, because "'a municipal corporation derives all of its powers from the state and . . . has only such powers as the Legislature has seen fit to grant to it,'" concluding from this fact that "'in the case of a direct conflict between a statute and a city ordinance, the statute is the superior law.'"[24]

---

[19] See *Gray v. City of Omaha, supra* note 14.

[20] Neb. Rev. Stat. § 71-6401 et seq. (Reissue 2009, Cum. Supp. 2014 & Supp. 2015).

[21] Neb. Rev. Stat. § 48-2101 et seq. (Reissue 2010).

[22] Neb. Rev. Stat. § 71-6318 et seq. (Reissue 2009).

[23] *Butler County Dairy v. Butler County, supra* note 3, 285 Neb. at 431, 827 N.W.2d at 286.

[24] *Id*. at 431, 827 N.W.2d at 286-87.

[9-11] There are three types of preemption: (1) express pre-emption, (2) field preemption, and (3) conflict preemption.[25] In all three cases, "'[t]he touchstone of preemption analysis is legislative intent.'"[26] Express preemption occurs when the Legislature has "'expressly declare[d] in explicit statutory language its intent to preempt' local laws."[27] Field preemption and conflict preemption arise in situations where the Legislature did not explicitly express its intent to preempt local laws, but we can infer such intent from other circumstances.

[12-14] In field preemption, legislative intent to preempt local laws is "'inferred from a comprehensive scheme of legislation.'"[28] When there is not comprehensive legislation on a subject, local laws ""may cover an authorized field of local laws not occupied by general laws, or may complement a field not exclusively occupied by the general laws."""[29] Indeed, """[t]he mere fact that the legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted."""[30] But """where the state has occupied the field of prohibitory legislation on a particular subject,"" there is no room left for local laws in that area and a political subdivision """lacks authority to legislate with respect to it."""[31] Because a comprehensive scheme of legislation effectively keeps localities from legislating in that area, we infer from such a scheme that the Legislature intended to preempt local laws.

[15] In conflict preemption, legislative intent to preempt local laws is inferred "'to the extent that [a local law]

---

[25] *Id.*

[26] *Id*. at 431, 827 N.W.2d at 287.

[27] *Id.*

[28] *Id*. at 432, 827 N.W.2d at 287.

[29] *Id.*

[30] *Id.*

[31] *Id.*

actually conflicts with state law.'"[32] As this court has previously explained, "'"[t]hat which is allowed by the general laws of the state cannot be prohibited by ordinance, without express grant on the part of the state. Conversely, without express legislative grant, an ordinance cannot authorize what the statutes forbid."'"[33] Nonetheless, when a court considers preemption claims, it "'is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject.'"[34]

### (i) Building Construction Act

Malone first argues that the licensing ordinance is preempted by the Building Construction Act. The purposes of that act are to (1) adopt a state building code, (2) provide standards with respect to building construction, and (3) provide for the use of innovation in building construction.[35] This act also requires cities to adopt a building code.[36]

Malone argues that the Building Construction Act does not allow for the licensing of contractors and neither does the State Building Code and that as such, the City cannot license them. We note that Malone is making field and conflict preemption arguments. As there is no express language dealing with contractor licensing, express preemption has no applicability here.

As noted above, legislative intent to preempt local laws is inferred from a comprehensive scheme of legislation.[37] When there is not comprehensive legislation on a subject, local laws may cover an authorized field of laws not occupied by general

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] § 71-6402.

[36] *Id.*

[37] *Id.*

laws, or may complement a field not exclusively occupied by the general laws. Only where there is no room left for local laws in that area does a political subdivision lack authority to legislate with respect to it.

The primary purposes of the Building Construction Act are to adopt a building code to govern the "construction, reconstruction, alteration, and repair of buildings" and to control the "design, construction, quality of materials, use and occupancy, and maintenance of buildings."[38] Thus, the reason for this act is to ensure that buildings are built safely and correctly. This act does not control in any way who builds the building, only that the person involved in the construction do so safely. Moreover, as we found above, this act forms part of the basis of the City's statutory authority to enact this ordinance. As such, we conclude that the ordinance is not preempted by the Building Construction Act.

### (ii) Contractor Registration Act

Malone also argues that the Contractor Registration Act preempts the City's ordinance. The purpose of the Contractor Registration Act is to require contractors doing business in the state to be registered with the state's Department of Labor. Section 48-2102 expressly provides that "[i]t is not the intent of the Legislature to endorse the quality or performance of services provided by any individual contractor."

Malone argues that the fact of registration, along with the statement that the State is not endorsing the quality or performance of a contractor, acts to preempt the ordinance. But this argument is not persuasive.

The mere fact that the Legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted.[39] There is nothing in the Contractor

---

[38] *Id.*

[39] *Butler County Dairy v. Butler County, supra* note 3.

Registration Act to suggest that a city cannot regulate contractors simply because the State also requires them to register. When deciding issues of preemption, an appellate court is required to try to harmonize the state and local law.[40] Here, the state law requires contractors to have their names entered into a state database. The local ordinance requires testing and licensing at the local level. The two can exist together, and the ordinance is not preempted by this act.

### (iii) Residential Lead-Based Paint Professions Practice Act

Finally, Malone argues that the Residential Lead-Based Paint Professions Practice Act preempts the ordinance. The purpose of this act is to set forth procedures and requirements for accreditation of training programs, licensure, and work practice standards for performing lead-based paint activities.

We cannot conclude that this act preempts the ordinance at question here. This is particularly true when the act specifically notes that

> abatement does not include renovation, remodeling, landscaping, or other activities when such activities are not designed to permanently eliminate lead-based paint hazards but instead are designed to repair, restore, or remodel a structure or dwelling even if such activities may incidentally result in a reduction or elimination of lead-based paint hazards.[41]

This act, then, controls the removal of the lead-based paint hazards; the ordinance controls the licensure of activities that are expressly excluded from the definition of lead-based paint abatement.

There is no merit to Malone's second through fourth assignments of error.

---

[40] *Id.*

[41] § 71-6319.02.

### 3. Right to Conduct Lawful Business

Malone next argues that the district court erred in concluding that the ordinance did not violate his constitutional right to conduct a lawful business and his right to privacy and property. Malone argues that the ordinance does not increase public safety in any way, yet it requires him to be licensed to engage in his contracting business, and that such is unconstitutional.

[16-18] The liberty to contract, the right to acquire and sell property in a lawful manner, and the right to conduct lawful business are constitutionally protected rights.[42] A regulatory statute adopted by virtue of the police power which has no reasonable relation to the public health, safety, and welfare is invalid.[43] The test of validity, then, is the existence of a real and substantial relationship between the exercise of the police power and the public health, safety, and welfare.[44] A statute under the guise of a police regulation, which does not tend to preserve the public health, safety, and welfare, is an unconstitutional invasion of the personal and property rights of the individual.[45]

Malone is correct that he has a constitutional right to conduct a lawful business. But so long as the regulation adopted by the City bears a reasonable relationship to the public health, safety, and welfare, the regulation of that right is permissible.

We have already concluded that the ordinance in this case operated to improve the health, safety, and welfare of the City's residents. That the regulation could have gone further, or that other regulatory methods might also be effective, does

---

[42] *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987), *abrogated on other grounds, State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990).

[43] *United States Brewers' Assn., Inc. v. State*, 192 Neb. 328, 220 N.W.2d 544 (1974).

[44] *Id.*

[45] *Id.*

not affect our conclusion that this ordinance bears a reasonable relationship to the public's health, safety, and welfare.

There is no merit to Malone's fifth assignment of error.

### 4. REMAINING ASSIGNMENTS OF ERROR

Having concluded that the district court did not err as explained above, we find no merit to Malone's sixth and seventh assignments of error.

### VI. CONCLUSION

The decision of the district court is affirmed.

AFFIRMED.

CONNOLLY and MILLER-LERMAN, JJ., not participating.