JOSEPH M. SASICH ET AL., APPELLANTS, V. CITY OF
OMAHA, A MUNICIPAL CORPORATION, ET AL., APPELLEES.

347 N.W.2d 93

Filed March 30, 1984. No. 83-156.

Donald A. Roberts, P.C., of Lustgarten & Roberts, for appellants.

Herbert M. Fitle, Omaha City Attorney, and Charles K. Bunger, and J. Thomas Rowen of Miller, Carpenter, Rowen, Fitzgerald and Coe, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Plaintiffs-appellants, Joseph M. and Kim L. Sasich

and other homeowners, hereinafter sometimes collectively referred to as Sasich, residing in the Fountain Hills subdivision of Douglas County, Nebraska, appeal from the district court's denial of their request that the defendant-appellee City of Omaha be enjoined from effectuating certain zoning ordinances enacted by its council. We affirm the judgment of the district court.

In 1965 Parks Construction Company erected a building upon a 10-acre parcel of land which is south of but fronts upon Pacific Street at 158th Street in Douglas County, Nebraska. The building and land are used as the headquarters of a construction company and yard for the storage of materials and equipment. At the time Parks bought the land and erected the building, the land was zoned M-1 by Douglas County. This land use classification generally allows for light industrial uses, of which Parks' use was a permitted one.

In 1967 the Parks land and the then undeveloped lands now owned by Sasich and the other homeowners were brought within the zoning authority of the City of Omaha, which classified the major portion of these lands as Second Suburban. This municipal zoning classification allows the land to be used for, among other things, single-family dwellings, agricultural purposes, churches, colleges, schools, libraries, parks, fire stations, hospitals, horticultural nurseries, stables, dog kennels, day care centers, and sanitary landfills.

In early 1982 Parks requested a change of zoning from the Omaha City Council. Its request was prompted by Parks' recent discovery that the zoning of the property had been changed in 1967, Parks' attention having been drawn to this fact by a potential buyer for the 10-acre parcel. The city planning department recommended to the city planning board that Parks' request be denied. The planning board nevertheless voted to recommend to the city council that the zoning be changed. The city council agreed

with the planning board, and by a 5-to-2 vote enacted four ordinances zoning certain portions of Parks' property First Industrial, First Industrial (Flood Plain), Parking One, and Parking One (Flood Plain). Sasich and other residents of the Fountain Hills subdivision, which is situated on the north side of Pacific Street between 156th and 160th Streets and extends north from Pacific Street to Howard Street, protested the proposed zoning ordinances, to no avail.

Sasich's 10 assignments of error arrange themselves into three issues: (1) Whether the action of the Omaha City Council in adopting the questioned zoning ordinances is arbitrary, capricious, unreasonable, an abuse of discretion, and in excess of its statutory zoning authority; (2) Whether the ordinances impermissibly perpetuate a nonconforming use; and (3) Whether the district court erred by refusing to receive in evidence the depositions of certain city council members who voted for the ordinances.

An action to enjoin enforcement of a city ordinance is one in equity. *Speier's Laundry Co. v. City of Wilber*, 131 Neb. 606, 269 N.W. 119 (1936). As such, in addressing the issues presented we review the record de novo, subject to the rule that where credible evidence is in conflict on material issues of fact, we will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Grint v. Hart*, ante p. 406, 343 N.W.2d 921 (1984); *Masid v. First State Bank*, 213 Neb. 431, 329 N.W.2d 560 (1983).

We recognize that the homeowners wish to frame the first issue as one involving impermissible "spot zoning" such as that found in *Weber v. City of Grand Island*, 165 Neb. 827, 87 N.W.2d 575 (1958). In that case an ordinance changed the residential zoning of a half-block area to a business zoning in order that a chain store could be located thereon. The property was surrounded by residences. This court found

that zoning ordinance to be impermissible spot zoning, as there was no evidence that the ordinance was designed to promote the health, safety, morals, or general welfare, and was also not in accord with the city's comprehensive plan. As will be shown later, these factors are considered in determining the validity of a zoning ordinance, whether the issue is framed as one involving spot zoning or otherwise. The case of *Keller v. City of Council Bluffs*, 246 Iowa 202, 66 N.W.2d 113 (1954), leads to our decision not to consider the ordinances in this case as presenting a spot zoning question. In that case lots in a residential neighborhood, which for many years had been the site of a nonconforming convalescent home, were rezoned to a less restrictive classification which permitted convalescent home use. The Iowa court found that issues raised by the spot zoning cases from other jurisdictions, including Nebraska, were not dispositive, since the ordinance merely recognized a previous nonconforming use. See, also, *Chayt v. Maryland Jockey Club*, 179 Md. 390, 18 A.2d 856 (1941); *Goddard v. Stowers*, 272 S.W.2d 400 (Tex. Civ. App. 1954).

In the present case Parks had been using the 10-acre parcel in a manner incompatible with the surrounding suburban-zoned property for approximately 17 years prior to the enactment of the city ordinances. Those ordinances did not allow the introduction of a new and unknown use of the property surrounding the homeowners' property. Accordingly, the question of spot zoning is not at issue here. This, however, does not end our inquiry. We must still determine if the zoning ordinances were a proper exercise of Omaha's statutorily granted zoning powers.

In making such a determination we are bound by the rule that the validity of a zoning ordinance is to be presumed in the absence of clear and satisfactory evidence to the contrary. *Weber v. City of Grand Island, supra*; *Davis v. City of Omaha*, 153 Neb. 460,

45 N.W.2d 172 (1950). We have also stated: " ' "It is difficult, if not impossible, to lay down any general rules describing the exact field of operation of such [a municipality's zoning] power that will fit cases arising in the future. Each must be controlled by the special conditions and circumstances surrounding it." ' " *Weber v. City of Grand Island, supra* at 831, 87 N.W.2d at 578.

Chapter 14 of the Nebraska Revised Statutes deals with the powers granted cities of the metropolitan class, of which Omaha is the only member. Among those is the power to enact zoning regulations. Neb. Rev. Stat. § 14-402 (Reissue 1977). Neb. Rev. Stat. § 14-403 (Reissue 1977) provides: "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to secure safety from flood; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements, and to promote convenience of access. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. Whenever the city council shall determine that the use or contemplated use of any building, structure or land will cause congestion in the streets, increase the danger from fire or panic, imperil public safety, cause undue concentration or congregation of people, or impede transportation, the council may include in such regulations requirements for alleviating or preventing such conditions when any change in use or zoning classification is requested by the owner."

Sasich claims that the ordinances were not in ac-

cordance with a comprehensive plan. In support of this claim Sasich introduced the testimony of an employee of the city planning department who testified that the future land use plan adopted in 1977, a portion of the city's master plan, indicated that the Parks property is to be used for residential purposes. Sasich is satisfied that the term "comprehensive plan" in § 14-403 refers to the future land use plan. We are not.

The term "comprehensive plan" is also contained in the zoning statutes covering cities of the primary class. Neb. Rev. Stat. § 15-901 (Reissue 1977). The term is defined and the requirements of a comprehensive plan for a city of the primary class are detailed at Neb. Rev. Stat. § 15-1102 (Reissue 1977). No such definition of the term is offered by the statutes covering cities of the metropolitan class, although Neb. Rev. Stat. § 14-373 (Reissue 1977) authorizes and requires such a city to develop a "city plan." In light of the fact that the Legislature saw fit to define the term "comprehensive plan" for cities of the primary class and not for cities of the metropolitan class, combined with the use of the term "city plan" and not "comprehensive plan" in § 14-373, we are drawn to conclude that the term "comprehensive plan" in the zoning statutes and the term "city plan" are not synonymous. Simply because a document prepared by the city planning department indicates that in 1977 it was envisioned that the Parks property would be used as residential property, regardless of the fact that it was then and for 12 years prior to that time used for industrial purposes, does not lead us to mechanically conclude that the questioned ordinances are not in accordance with a comprehensive plan.

In *Davis v. City of Omaha*, 153 Neb. 460, 45 N.W.2d 172 (1950), a zoning ordinance which would allow high rise apartments in a residential area previously limiting apartment complexes to six units was found invalid. In that case this court found that the zoning

action did not follow a comprehensive plan. Therein, it was shown that the area surrounding the subject property was of essentially the same character and zoning. We stated at 469, 45 N.W.2d at 177: "By way of application of section 14-403, R.S. 1943, to the disclosed situation this zoning action clearly did not follow a comprehensive plan. It applied to only one block among several whose condition, position, and relation to each other was the same or similar." It is apparent from this opinion that the term "comprehensive plan" is used with respect to a metropolitan city in its generic sense and does not refer to any special document. The essence of the term "comprehensive plan" implies that not just the subject property but other similarly situated property is considered in the zoning decision. It requires rationality and some degree of consistent treatment. Applying this definition to the situation at hand, Sasich has not shown that the rezoning of the Parks property is not in accordance with a comprehensive plan. The future land use plan shows that almost all of the land which abuts on or lies near the main rail line of the Union Pacific, as it crosses the length of the city, is designated as industrial and that industrial zoning lies between the rail tracks and a major street, serving as a buffer to the residential areas. A nearly identical situation is present here. The Parks property corners on the Union Pacific right-of-way, and the residential areas to the north are buffered by a major street. Other than pointing to the fact that the zoning does not jibe with the future land use plan, Sasich makes no other showing that the zoning is not in accordance with a comprehensive plan. As such, the burden to produce clear and satisfactory evidence that the ordinances are not in accordance with a comprehensive plan has not been met on this point.

Sasich further contends that the city has not stayed within its statutory guidelines as found in § 14-403, in that the zoning regulation does not lessen

congestion in the streets or promote public safety, health, and general welfare. The city presented evidence that the zoning would promote the general welfare by encouraging economic development and creating jobs. We do not read § 14-403 to require that each zoning ordinance achieve each of the beneficial purposes listed by the statute. It is hard to imagine any restriction on the use of land which could possibly promote each of those diverse interests. The last sentence of § 14-403 implicitly supports this interpretation. It provides: "Whenever the city council shall determine that the use or contemplated use of any building, structure or land will cause congestion in the streets, increase the danger from fire or panic, imperil public safety, cause undue concentration or congregation of people, or impede transportation, the council may include in such regulations requirements for alleviating or preventing such conditions when any change in use or zoning classification is requested by the owner."

The subject property which is zoned P-1 is required to be landscaped. The P-1 zoning designation completely surrounds the industrial-zoned portion of Parks' property, and a plan for the planting of trees and shrubs around the property has been filed with the city planning department.

In short, it appears that the zoning ordinances were enacted with due regard to the health, safety, and general welfare of the community, and within statutorily granted powers as enumerated in § 14-403.

The second issue raised by Sasich's appeal is whether the zoning ordinances impermissibly perpetuate a nonconforming use. Sasich's theory seems to be that a zoning ordinance which recognizes and legitimizes a nonconforming use is objectionable upon that basis alone. In support of this somewhat mysterious theory, we are cited to *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964). In that case the plaintiff operated a dog kennel at his

residence, an operation which predated a city ordinance forbidding such activity. The ordinance was later amended to provide that any nonconforming use would cease as of a certain date. The owner of the kennel sought a ruling that the amendment was unconstitutional. We held that it was not. We do not understand how a case which allows the city to eliminate a nonconforming use by banning a prior use can be said to support the proposed theory. While we did state in *Wolf*, citing from another jurisdiction, " 'It was not and is not contemplated that pre-existing nonconforming uses are to be perpetual,' " *id*. at 566, 129 N.W.2d at 513, the applicability of that statement to the present facts does not support Sasich's theory. The ordinances in question herein do not perpetuate a nonconforming use, they destroy that characterization of Parks' use of the property. The ordinances make Parks' present use a conforming and lawful one.

The last issue raised by Sasich's assignments of error involves an evidentiary question. The district court refused to accept into evidence depositions of certain Omaha City Council members who voted for the zoning ordinances. The depositions would show, Sasich contends, the reasons that these council members voted for the ordinances. Sasich argues that those depositions are relevant because they would show that those council members did not believe the zoning change would promote the health, safety, morals, or general welfare of the community.

In determining whether the exercise of legislative authority by a city council is within its statutorily granted powers, we are not concerned with the motives, purposes, or personal beliefs of an individual city council member. If an ordinance in question is a valid exercise of the power granted to a city, courts will not inquire into the motives or reasons of the city council in enacting it. *Dundee Realty Co. v. City of Omaha*, 144 Neb. 448, 13 N.W.2d 634 (1944). See, also, *Angle v. Chicago, St. Paul &c.*

*Railway*, 151 U.S. 1, 14 S. Ct. 240, 38 L. Ed. 55 (1894). In this case it was incumbent upon Sasich to show that the zoning ordinances did not meet the requirements of the relevent zoning statutes. That burden must be met without involving the judicial branch of government in a probe of the reasons motivating a particular elected official's vote on the matter. We are concerned here with the question of whether the city council had the legitimate power to do what it did, not with the mental machinations of the persons exercising that power. The trial court correctly excluded the depositions of the council members.

An additional matter presents itself upon our review of the record, which neither party addresses in the briefs, but which merits comment. A member of the legal academic community was allowed to testify, over objection, concerning his review and analysis of our opinions in cases involving zoning disputes. Such testimony is irrelevant and inadmissible. 32 C.J.S. *Evidence* § 546(86) (1964). The general rule is that relevant evidence is admissible. Neb. Rev. Stat. § 27-402 (Reissue 1979). Relevant evidence is that which has a tendency to make the existence of a *fact* of consequence to the determination of an action more probable or less probable. Neb. Rev. Stat. § 27-401 (Reissue 1979). While our rules of evidence allow for expert testimony, that testimony must be such as to assist the trier of fact to understand the evidence or to determine a fact issue. Neb. Rev. Stat. § 27-702 (Reissue 1979). Expert testimony concerning the status of the law generally accomplishes neither of these goals. While we do not underestimate the value of legal scholars in providing the judiciary of this state with stimulating and often persuasive commentaries on the state of our law, how particular cases fit, or do not fit, within a body of law, the better reasoned view of a particular rule, even the perceived future direction of the law, and a host of other matters, their scholarship should not reach a judge's attention by way of

the witness stand. When a judge considers the works of legal academicians to be of potential aid in the exercise of his judicial function, he will seek that help in the published treatises and journals. If a party fears that a judge may neglect to consider a valuable and persuasive opinion of a legal scholar, his attention may be directed to the work in an appropriate brief.

AFFIRMED.