SANITARY AND IMPROVEMENT DISTRICT NO. 347 OF
DOUGLAS COUNTY, NEBRASKA, AND CHRISTOPHER B. DENNIS,
APPELLEES, V. CITY OF OMAHA AND SIMMONDS RESTAURANT
MANAGEMENT, INC., APPELLANTS.

589 N.W. 2d 160

Filed February 2, 1999.   No. A-97-831.

James B. Cavanagh, of Lieben, Dahlk, Whitted, Houghton, Slowiaczek & Jahn, P.C., for appellant Simmonds Restaurant Management, Inc.

Bernard J. In Den Bosch and Charles K. Bunger for appellant City of Omaha.

Ronald W. Hunter for appellees.

IRWIN, Chief Judge, and HANNON and SIEVERS, Judges.

SIEVERS, Judge.

The Omaha City Council adopted a zoning ordinance which rezoned a portion of Greenfields Plaza from a limited commercial district (LC) to a community commercial district (CC). After the zoning change, the property was purchased by

Simmonds Restaurant Management, Inc. (Simmonds). The change would allow Simmonds to construct a Burger King restaurant with a drive-through window on the property, as it wished to do. That Burger King project was the focus of the rezoning proceedings before the city council. The land is fully described in the lower court pleadings and proceedings. Thus, for our purposes, it is sufficient to refer to it simply as parts of Lots G and H in Greenfields Plaza. The land is located immediately to the southwest of the intersection of 156th Street and West Dodge Road. Sanitary and Improvement District No. 347 of Douglas County, Nebraska (SID No. 347), and Christopher B. Dennis (Dennis) sued the City of Omaha (City) and Simmonds in the district court for Douglas County to void the zoning change. The district court found that the change of zoning was unreasonable and arbitrary and, as a result, null and void.

## FACTUAL BACKGROUND

On May 17, 1994, the city council adopted ordinance No. 33268, which changed the zoning of Lots G and H in Greenfields Plaza from LC to CC. The change would allow the construction and operation of a fast-food restaurant with a drive-through facility. Simmonds had an agreement to purchase the site, conditioned upon it being rezoned to CC. Simmonds purchased the site in August 1994 for $250,000. In late September 1994, SID No. 347 and Dennis filed their lawsuit to enjoin the implementation of rezoning ordinance No. 33268. We have included a drawing of the area involved in this litigation which shows the intersection of West Dodge Road and 156th Street, an access road (which we will refer to as "South Frontage Road"), Greenfields Plaza, and some of the surrounding neighborhood. Immediately to the southwest of the intersection of 156th Street and West Dodge Road lies Greenfields Plaza, which has no direct access from West Dodge Road. One can get into Greenfields Plaza by turning southbound off of West Dodge Road at 163d Street and proceeding eastbound on Chicago Street which turns into South Frontage Road as it passes in front of Greenfields Plaza. A second method to get into Greenfields Plaza is to exit from 156th Street westbound

onto South Frontage Road. South Frontage Road ultimately runs along the north edge of Greenfields Plaza and intersects with 156th Street.

In 1987, Greenfields Plaza was initially zoned LC, but by the spring of 1994, the surrounding area had changed with the construction of approximately 300 single-family homes. Some historical perspective may be helpful. B.H.I. Development, Inc. (BHI), the owner of Greenfields Plaza, filed an application in 1990 with the city planning department for the rezoning of a portion of Greenfields Plaza, Lots 193 and 194, from LC to CC to allow for the construction of a Goodyear tire store. The city planning board initially recommended denial of this zoning change but granted a motion for reconsideration. After a second hearing, the city planning department maintained its recommendation to deny the rezoning, but the city planning board reversed itself and on a 4-to-3 vote recommended the rezoning from LC to CC for the Goodyear store. The city council granted that zoning change.

Residents of the Greenfields residential subdivision instituted litigation to stop the rezoning of Lots 193 and 194 in Greenfields Plaza for the Goodyear store. In the settlement of that litigation, BHI agreed that it would not submit a future request for rezoning for six specified uses: (1) automotive washing, (2) hotel-motel, (3) pawnshop services, (4) auto repair, (5) laundry services, and (6) video arcade entertainment.

Thereafter, the proposal to rezone Lots G and H to LC so that Simmonds could build a Burger King with a drive-through emerged.

In the course of the rezoning process for Lots G and H and the passage of ordinance No. 33268, an attorney for the board of trustees of SID No. 347 wrote a letter to the city clerk and sent copies of the letter to city council members. This letter states:

> The Board of Trustees wish[es] to make it clear that it does not take any position, either for or against the proposed rezoning of the Burger King store. The SID's only interest is whether there is presently a traffic problem at the intersection of the frontage road and 156th Street, whether there will be one in the foreseeable future, and, if there is or will be such a problem, the solutions the consulting engineers recommend.

As is foretold by the above letter, the focus of this litigation became traffic. A study of the impact of the proposed Burger King on traffic was undertaken by HDR Engineering, Inc. (HDR), at the commission of SID No. 347. But the particular HDR engineer, Matthew Tondl, involved in the study appeared at trial as a witness for the City and Simmonds. The study approaches 50 pages in length, thus, we summarize the major findings of the study:

1. South Frontage Road's geometrics are consistent with a two-lane, low volume, frontage road and will not support a three-lane roadway. Other frontage roads along the West Dodge Road corridor are wider, provide more intersection capacity, are continuous between arterial streets, and are integrated into the system.

2. Upon closure of 163d Street, South Frontage Road will serve as a driveway to a 75,000 square-foot commercial area, a 96-unit apartment complex, and, to a large extent, a 260-lot residential subdivision—a very unique situation.

3. Excessive delays exist today for outbound traffic on South Frontage Road, and traffic signalization is necessary to support any further increase in traffic.

4. Upon full buildout of business in Greenfields Plaza, as current zoning permits, peak hour traffic volumes on South

Frontage Road will increase 44 percent, and if a fast-food restaurant is constructed, the increase will be 67 percent.

5. Upon closure of 163d Street, these increases will be 78 percent and 102 percent, respectively.

6. With or without the Burger King, and without improvements on South Frontage Road, an undesirable level of service will result upon completion of the commercial area.

7. The volume of traffic on South Frontage Road will range between 9,200 and 10,400 vehicles per day upon full buildout. This is greater than the 8,500 vehicles per day predicted at full buildout of the Methodist health system outpatient campus, which will have a four-lane roadway with a separate left-turn lane constructed at the 156th Street intersection.

8. Construction of a three-lane roadway on South Frontage Road will allow an acceptable level of services to be achieved both with and without a fast-food restaurant.

9. Cars lined up on South Frontage Road during peak hours will block the first two driveways of Greenfields Plaza.

10. Several of the commercial driveways along the side frontage road presently have inadequate and unsafe sight distances to the location of driveways on the curve and inappropriately placed landscaping.

11. Internal circulation within Greenfields Plaza is poorly designed, with the potential for internal gridlock.

12. The general capacity of a two-lane roadway is exceeded by 156th Street, and unsafe pedestrian facilities exist which promote random crossings of the street. A number of schools along 156th Street produce a significant number of school-age children along that street.

The district court found that the rezoning ordinance was arbitrary and unreasonable, and enjoined its enforcement. We set forth in summary fashion 10 key findings of the district court:

1. Traffic already stacks up and is congested at South Frontage Road and 156th Street, and the building of the Burger King will compound that problem, particularly in view of the fact that the 163d Street entrance to West Dodge Road will be closed.

2. Considering Neb. Rev. Stat. § 14-403 (Reissue 1997), the proposed rezoning is not designed to lessen congestion and will

have the opposite effect, nor will it promote convenience of access. While traffic lights at South Frontage Road and 156th Street will regulate traffic, they will not reduce traffic.

3. There is limited parking at the proposed Burger King.

4. Customers will come to the proposed site from a 2- to 3-mile radius.

5. The Burger King will attract approximately 865 vehicles per day on weekdays and 1,000 vehicles on Saturday and Sunday.

6. Upon "full buildout" of the area, peak hour volumes of traffic on South Frontage Road will increase 44 percent, but with a fast-food restaurant, the increase will be 67 percent. After closure of 163d Street, the increases will be 78 and 102 percent, respectively.

7. Closure of 163d Street will add approximately 1,600 vehicles per day to South Frontage Road and 156th Street.

8. The queues onto South Frontage Road will likely block the first two driveways of Greenfields Plaza.

9. On occasion, queues from the Amoco carwash back onto South Frontage Road.

10. The proposed rezoning is immediately adjacent to a largely developed area of family residences rather than in an undeveloped area.

The court found, referencing the settlement of the earlier litigation involving Greenfields Plaza and the Goodyear store, that the proposed Burger King was not a "Grandmother's" or "Caniglia['s]" type restaurant, as was expressly contemplated in the settlement of that litigation for future development. The court further found that the rezoning bore no relationship to the objectives set forth in § 14-403 (zoning regulations are to lessen congestion, promote health and welfare, and secure safety) and that the action of the city council was not supported by the evidence. The City and Simmonds have timely appealed the district court's decision which voided the rezoning.

## STANDARD OF REVIEW

In an appeal from an equitable action, the reviewing court reviews the action de novo on the record and reaches a conclusion independent of the factual findings of the lower court;

however, where credible evidence is in conflict on a material issue of fact, the reviewing court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 660, 515 N.W.2d 390 (1994).

An action to enjoin enforcement of a city ordinance is one in equity, which is tried de novo on the record, and is subject to the rule that where credible evidence is in conflict on issues of material facts, an appellate court will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984). The validity of a zoning ordinance is presumed in the absence of clear and satisfactory evidence to the contrary. *Id.* On questions of law, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court. *State ex rel. Bellino v. Moore*, 254 Neb. 385, 576 N.W.2d 793 (1998).

## ANALYSIS

*Standing of SID No. 347 and Dennis.*

The City and Simmonds contend that neither SID No. 347 nor Dennis had standing to bring this action to enjoin the enforcement of the rezoning ordinance. The district court found that both SID No. 347 and Dennis had standing. While there are numerous assignments of error, it is logical to address the question of standing first.

The general legal doctrines which apply to determine standing are well established. Before a party is entitled to invoke a court's jurisdiction, that party must have standing to sue, which involves having a real interest in the cause of action. *SID No. 57 v. City of Elkhorn*, 248 Neb. 486, 536 N.W.2d 56 (1995). To have standing to sue, a party must have some legal or equitable right, title, or interest in the subject matter of the controversy, and the purpose of the standing inquiry is to determine whether the party has a legally protected interest or right in the controversy that would be benefited by the relief to be granted. *Id.*, citing *City of Ralston v. Balka*, 247 Neb. 773, 530 N.W.2d 594 (1995). In situations where a party seeks to restrain

an act of a municipal body, as is the case here, the party must show some special injury peculiar to himself aside from a general injury to the public, and it is not sufficient that the party bringing the suit has merely a general interest common to all members of the public. *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth.*, 220 Neb. 504, 371 N.W.2d 258 (1985). In *SID No. 57, supra*, a contest over the validity of the partial annexation of Skyline Ranches, the court found that the plaintiffs did not have standing because neither the entity nor the individuals bringing the appeal were "residents, property owners, taxpayers, or electors of Skyline Ranches. They therefore have no standing to claim that ordinance No. 288 is void and illegal." 248 Neb. at 495, 536 N.W.2d at 64. Here, the parties seeking to enjoin the City's rezoning ordinance are not residents, tenants, or owners of property in Greenfields Plaza. Thus, at the outset, it is apparent that their interest in the subject matter is something less than direct.

■ In this case, the City and Simmonds' demurrers on the basis of standing were overruled, and they assign the overruling of the demurrers as error, in addition to their assignment that the trial court erred in finding that SID No. 347 and Dennis had standing. But we consider the two assignments together, because standing is not merely a pleading requirement, but an indispensable component of a party's case. *Professional Firefighters of Omaha v. City of Omaha*, 243 Neb. 166, 498 N.W.2d 325 (1993). We take this holding to mean that SID No. 347 and Dennis, or at least one of them, must, as part of their proof, show that they have standing. In *SID No. 57, supra*, the court considered whether the trial court had properly sustained a demurrer to the pleading of one of the appellants who, although a resident of the area whose annexation by the city was under attack, had not alleged a special or particular injury. The Supreme Court, in upholding the sustaining of the demurrer by the trial court, said that only a general injury was alleged, which the court had previously said was inadequate for standing purposes. Here, the 35-page petition in equity has been thoroughly studied, and we do find a general allegation that SID No. 347 and Dennis will suffer irreparable harm from the rezoning. But, the closest the petition comes to defining the "irreparable harm"

or alleging special harm is that SID No. 347 developed Pacific Meadows II and III in reliance on the fact that the zoning in the area at issue will be LC zoning and that the board of trustees of SID No. 347 "fear there will be a decline" in the market value of homes in the area which will reduce SID No. 347's tax base. The feared decline is alleged to come from the poor access in and out of the area caused by the change in zoning which will in turn cause traffic congestion. This is as close as we can come to finding an allegation of a special injury caused by the rezoning ordinance. There are allegations about an increase in traffic, and we believe it is fair to say the entire focus of SID No. 347 and Dennis' evidentiary presentation was traffic, in one form or another.

The district court's decision on the demurrer was to overrule it as to SID No. 347 because of Neb. Rev. Stat. § 31-732 (Reissue 1998), which the district court characterized as "very broad in that regard." As to Dennis, the court found his capacity to sue "somewhat tenuous," but nonetheless, the demurrer was overruled. The statute cited by the district court, § 31-732, recites that a sanitary and improvement district (SID) "shall have the power and authority to take and hold real and personal property necessary for its use, to make contracts, to sue and be sued . . . and to exercise any and all other powers, as a corporation, necessary to carry out the purposes of [Neb. Rev. Stat. §§] 31-727 to 31-762 [(Reissue 1998)]." To the extent that the statutory language "to sue and be sued," by itself, was seen by the district court as conferring standing, we disagree. The common-law principle of standing involves something far beyond the mere fact that an SID is statutorily authorized to file a lawsuit. The statute does not exempt an SID from the requirement imposed on all litigants that they have standing. It appears that the district court's ruling on the demurrer confused statutory power to sue with standing to sue. A petition is subject to demurrer if it fails to show that the plaintiff has standing to sue. *West Fort Residents Assn. v. Housing Auth. of City of Omaha,* 205 Neb. 397, 288 N.W.2d 27 (1980) (holding that plaintiff, which was composed of Douglas County residents, lacked standing to sue to stop proposed housing project). We put aside the matter of the demurrers for the moment and address whether

the evidence adduced by SID No. 347 and Dennis at trial established that they had standing to sue.

The plaintiff Dennis resides at 318 North 160th Street in Omaha, Nebraska, located within Pacific Meadows II, one of the residential areas developed by SID No. 347. Dennis lives on one of the two north-south roads into Pacific Meadows II, which is adjacent to Greenfields Plaza. There are no allegations in the petition of any special damage which Dennis will suffer if the rezoning proceeds.

As for Dennis' evidence of special damage, he points to his testimony that traffic seeking to avoid congestion on South Frontage Road caused by the presence of the Burger King will use 160th Street. The extent of such traffic was never quantified. Dennis testified that such traffic poses a risk to him because, as a result of an injury, he has difficulty walking, plus he is concerned about his young sons and the traffic. Additionally, he testified to being concerned about depreciation in the value of his home. However, the evidence does not reveal with any measure of certainty that the proposed Burger King in Greenfields Plaza will increase traffic on 160th Street, an entirely different question than the impact on traffic at Greenfields Plaza itself. But, Dennis has nothing to do with Greenfields Plaza, other than living close to it.

The other plaintiff, SID No. 347, is an SID created to develop a residential area known as Pacific Meadows II and III, which encompasses about 300 homes. At the time of trial, this residential area on its west edge had access to West Dodge Road via 163d Street. Access to West Dodge Road on the east edge of the development is indirect via South Frontage Road, which, at its eastern end, empties into 156th Street. From there, a vehicle proceeds north on 156th Street a short distance, and then it can turn left or right onto West Dodge Road.

The evidence establishes that as many as 1,000 vehicles on a weekend day will use the Burger King, and about 850 on a weekday. Those vehicles can only get into Greenfields Plaza to the Burger King by using South Frontage Road, which will result in some degree of shared use of that road with residents of Pacific Meadows II who are exiting or entering the residential area. Obviously, and as one would expect, the evidence confirms that

there will be an increase in the number of vehicles using South Frontage Road. But, it is important to remember that the Burger King traffic, which is predicted to be mostly traffic pulling off of West Dodge Road, will use only a small portion of South Frontage Road. There is no evidence, nor is there a reasonable inference from the evidence, that the Burger King traffic will go into Pacific Meadows II and use its streets and increase traffic within the residential area. While the trial judge observed this case is about "traffic, traffic, traffic," merely proving an increase in traffic at the location to be rezoned does not show the special injury needed to establish standing.

While the appellate courts of this state have not spoken to the threat of increased traffic as a basis for providing plaintiffs with standing in zoning cases, other jurisdictions have addressed the matter. We examine some of those cases for guidance, bearing in mind the fundamental notion that not everyone is entitled to sue anyone for whatever reason he or she may choose. See *Hall v. Cox Cable of Omaha, Inc.*, 212 Neb. 887, 327 N.W.2d 595 (1982) (ratepayer cannot sue to attack rate set by legislative body on basis that plaintiff thinks service should be provided cheaper, absent showing of discrimination or violation of statute). There is at least a superficial analogy between *Hall, supra,* and the instant case, because the essence of this case is that SID No. 347 and Dennis think there should be less traffic in and around Greenfields Plaza than did the city council. It goes without saying that rezoning to allow a Burger King with a drive-through will increase traffic and that the city council understood that proposition.

Ordinarily, one whose property is not located within a zoned area has no standing to attack the zoning ordinances or measures applicable to the zoned area. 8A Eugene McQuillin, The Law of Municipal Corporations § 25.292 (3d ed. 1994). This case is what may be called a " 'neighbor's case,' " which occurs when a developer requests and receives from the zoning authority, in this case the City, a less restrictive zoning classification which is then challenged by the "neighbor," with the result that the developer and the zoning authority are aligned against the "neighbor." See 1 Norman Williams & John Taylor, American Planning Law, Land Use and the Police Power § 2.01

at 72 (1988). Examination of authority from other jurisdictions reveals that concerns based upon diminution of real estate values and congestion from increased traffic are typically inadequate to give a "neighbor" standing to challenge a zoning change. In *Davis v. City of Archdale,* 81 N.C. App. 505, 506, 344 S.E.2d 369, 370 (1986), the city by ordinance annexed two tracts of land, and the plaintiffs, owners of property " 'in the area' " of the tracts, sued to stop the annexation. The trial court dismissed the complaint because of a lack of standing. The North Carolina appellate court recited that the plaintiffs, whose property was not being annexed, claimed that their property values would decrease because of increased traffic and the resulting demands on already overburdened roads and public utilities. The *Davis* court said that such damages were not "special damages distinct from those of the rest of the community" and that as a result, the plaintiffs did not have standing. *Id.* at 508, 344 S.E.2d at 371. Here, it cannot escape notice that neither SID No. 347 nor Dennis are located in, or own property in, the area to be rezoned.

However, increased traffic can generate standing in some circumstances. A challenge to zoning which would have allowed the construction of an open-air theater for rock concerts, jazz festivals, and country and western programs illustrates the point. In *Barrington Hills v. Hoffman Estates*, 81 Ill. 2d 392, 394, 410 N.E.2d 37, 38 (1980), *cert. denied* 449 U.S. 1126, 101 S. Ct. 943, 67 L. Ed. 2d 112 (1981), the corporate limits of the plaintiff villages were " 'adjacent or in close proximity to the property' " at issue, but the suing villages did not have zoning jurisdiction over the property proposed for development. Nonetheless, the plaintiff villages alleged that the theater project, with a capacity for 21,000 people, parking for over 6,000 vehicles, and associated commercial and concession activities, would require additional police at an annual cost of $42,000 for one plaintiff village and $24,000 for the other. The plaintiff villages alleged such cost would occur from the need for additional officers and squad cars, plus the diversion of existing police resources from the task of protection of the villages' residential areas. The plaintiff villages also alleged damage by way of such things as increased exhaust emissions, substantial

increases in sound levels, and the "general impairment of the health, safety and welfare of residents of both municipalities." *Id.* at 396, 410 N.E.2d at 39.

The Supreme Court of Illinois found that the two plaintiffs in *Barrington Hills, supra,* did have standing, because the allegations when treated as true showed that the villages would need to hire additional police and add additional police vehicles to deal with congestion and that they would suffer additional expense in clearing debris and litter off of their roads and highways. The Illinois court said that such matters "portend direct, substantial and adverse effects upon the plaintiff municipalities in the performance of their corporate obligations, thus giving them a real interest in the subject matter of the controversy." *Id.* at 398, 410 N.E.2d at 40.

Applying the principles evident from *Barrington Hills, supra,* the Appellate Court of Illinois found a lack of standing where the primary effect of the challenged rezoning was increased traffic in *Riverwoods v. Buffalo Grove,* 159 Ill. App. 3d 208, 511 N.E.2d 184 (1987). The court reversed the judgment of the trial court, which had found standing to challenge the rezoning ordinance, saying:

> Plaintiff essentially is concerned with possible increased traffic, yet the evidence presented as to the magnitude of that effect was generalized and speculative. Considering that traffic at the intersection of the proposed development is already heavy, and expected to increase even if the site remains undeveloped, any impact by the development upon Riverwoods municipal expenditures is *de minimus* [sic].

*Id.* at 212, 511 N.E.2d at 186.

Here too, the evidence about the effect on the "neighbors" and their residential area is, at best, generalized and speculative. Moreover, there is no hard evidence of discernible and direct costs which SID No. 347 and Dennis will incur by having a Burger King in a strip mall which adjoins their neighborhood.

Some jurisdictions refer to the question of standing as whether the plaintiff is an "aggrieved person." In *Joseph v. Grand Blanc,* 5 Mich. App. 566, 147 N.W.2d 458 (1967), the court found that a mere increase in traffic with its incidental

inconvenience did not constitute substantial damage and was not enough to make a plaintiff an aggrieved party for purposes of acquiring standing to challenge zoning. The court in *Joseph* reasoned that traffic congestion is a matter for the police authorities of a municipality rather than the zoning authorities. This rather restrictive view of standing appears to have been the law of Michigan until the Michigan Legislature enacted a statute which gave a person having " 'an interest affected by the zoning ordinance' " a right to appeal from a board of zoning decision to a circuit court. See *Brown v E Lansing Zoning Bd*, 109 Mich. App. 688, 692, 311 N.W.2d 828, 830 (1981). The court in *Brown* said that "possible adverse effects" are sufficient to confer standing to challenge a zoning ordinance. *Id.* at 700, 311 N.W.2d at 834. The significance for us of the Michigan cases is that it was only loosening by a specific statute of the standing requirement which made *Joseph, supra*, obsolete and unduly restrictive. We have no similar statutory provision in Nebraska which will allow a finding of standing merely by showing a possibility of "adverse effects."

In *Cohen v. Zoning Bd. of Appeals*, 35 Mass. App. 619, 624 N.E.2d 119 (1993), the court considered an appeal after a motion for summary judgment. The record contained an affidavit from a professional traffic engineer supporting the plaintiff's claim of adverse effect from the zoning. That engineer predicted a reasonable likelihood of increased delays in traffic flow and inability to make left turns onto a particular street, and the engineer predicted that because of long lines of vehicles, patrons would be impeded from getting in and out of the Dunkin' Donuts facility. Although the court found that the evidence was general and conclusory, for purposes of its decision, the court assumed that the increased traffic and resulting delays would occur. Nonetheless, the court in *Cohen, supra*, still found a lack of a specific showing that the plaintiff would be injured or that such injury was special and different from that which others throughout the area would experience. The *Cohen* court cited the rule that individual or corporate property owners acquire standing by asserting a plausible claim of a definitive violation of a private right, a private property interest, or a private legal interest which they must establish by direct facts

rather than speculative personal opinion that their injury is special and different from the concerns of the rest of the community. Subsequent to *Cohen*, the Massachusetts Supreme Judicial Court ruled that only a " 'person aggrieved' " may challenge a decision of a zoning board of appeals, which is held to mean a person who has suffered some infringement of his legal rights which is more than speculative. *Marashlian v. Zoning Board of Appeals of Newburyport*, 421 Mass. 719, 721, 660 N.E.2d 369, 371 (1996).

*Marashlian* involved the proposed construction of a hotel with guest rooms, a restaurant, a banquet room, and meeting rooms. At issue was a zoning variance which would allow the development of the hotel project with less than the normally required parking spaces and front footage. The plaintiffs owned commercial and residential property adjacent to and directly across the street from the proposed hotel. The court acknowledged that there would be some minimal increase in traffic and that public parking spaces would be lost. Those matters were neither speculative nor too remote to prevent the plaintiffs from being persons "aggrieved." In a footnote, the *Marashlian* court compared what it called the "tangible loss of parking spaces and increased traffic" to the plaintiffs' claim in *Harvard Square Defense Fund, Inc. v. Planning Bd. of Cambridge*, 27 Mass. App. 491, 540 N.E.2d 182 (1989), that headlights from automobiles in an adjacent parking lot would possibly shine in the plaintiffs' windows. *Marashlian*, 421 Mass. at 724 n.5, 660 N.E.2d at 373 n.5. The Massachusetts Supreme Judicial Court in *Marashlian* characterized the standing claim in *Harvard Square Defense Fund, Inc., supra*, as "just the type of 'uncorroborated speculations' sought to be avoided by the standing requirements of [the Massachusetts statute]." *Marashlian*, 421 Mass. at 723 n.5, 660 N.E.2d at 373 n.5.

In applying the Massachusetts cases to the case at hand, we recall the claim of SID No. 347 and Dennis that traffic will increase in the Pacific Meadows II and III neighborhoods which will wear down the streets, increasing the need for repair. This is the sort of uncorroborated speculation which prevents a finding of standing. In this regard, we emphasize that we read the evidence to establish only that there will be an increase in traf-

fic at the intersection of 156th Street and South Frontage Road, and then into the Burger King and back out. Whether that traffic somehow finds its way into the residential neighborhood or causes the residents to vary their traffic patterns, given that the vast majority of the Burger King business is at the lunch hour, is pure speculation. Additionally, we recall the testimony of John Melaniphy, who may fairly be characterized as a "fast-food site location expert." Melaniphy's testimony was that Greenfields Plaza was a poor site because South Frontage Road would become congested, causing the location to become inconvenient, so that people would not use the facility. His testimony was that this would be called a "highway location," as it did not have a surrounding retail base and its customers would come off of the principal arterial street, West Dodge Road. From this testimony, offered by SID No. 347 and Dennis, the evidence of a direct impact on the adjacent neighborhood, even an impact as tenuous as the loss of public street parking as in *Marashlian, supra,* is simply not to be found in the record.

█ In Georgia, the test for standing to attack zoning is that a plaintiff must show special damages under the substantial interest-aggrieved citizen test. *Macon-Bibb County, Etc. v. Vineville, Etc.,* 218 Ga. App. 668, 462 S.E.2d 765 (1995). The Georgia court defined the test as the person aggrieved must have a substantial interest in the zoning decision and that the interest be in danger of suffering some special injury or damage not common to all similarly situated property owners. The Georgia appellate court quoted at length from the Georgia Supreme Court's opinion in *Lindsey Creek Area v. Consolidated Govt.,* 249 Ga. 488, 292 S.E.2d 61 (1982), which we find informative in this case:

> "The mere increase in traffic congestion adjacent to one's property as the result of improvements erected on nearby property and the attendant inconvenience resulting therefrom which are damages suffered alike by all property owners similarly situated, does not give to one individual such a substantial interest in the decision of the [Zoning Commission] permitting the improvement as to authorize an appeal therefrom. Such an inconvenience is a condition incident to urban living. It is merely the result of

normal, urban growth and development. To hold that such an inconvenience would give to any resident or property holder of an urban area the right to override the decisions of boards of zoning appeals any time such property owner or resident disagreed with such decision would be a dangerous precedent to establish. It would result in materially slowing, if not completely stopping, the inevitable and necessary growth of large modern cities."

*Macon-Bibb County, Etc.*, 218 Ga. App. at 670-71, 462 S.E.2d at 766.

To show that it has sustained a special injury, SID No. 347 points to four factors: (1) The westerly extension of South Frontage Road, which is designated Chicago Street, was required to be constructed as three lanes; (2) SID No. 347 must maintain its streets, and increased traffic will increase that cost; (3) the increased traffic will pose safety concerns for residents and their children; and (4) if widened streets or increased lighting become necessary later, SID No. 347 will bear that cost.

SID No. 347 asserts in its brief that at the time of development, it was required to construct Chicago Street as a three-lane street as it traverses east and west through Pacific Meadows II. Chicago Street is the extension of South Frontage Road as it proceeds in a westerly direction into Pacific Meadows II. The cost of making Chicago Street three lanes in width from 163d Street to approximately slightly east of 160th Street was borne by SID No. 347. SID No. 347 claims that because the access road in front of Greenfields Plaza is only two lanes, creating a natural bottleneck for traffic, the money it spent to make Chicago Street three lanes was wasted money and, therefore, a special injury which gives it standing. But, this is a suit for an injunction, not a monetary claim for being forced to unnecessarily spend money to build a three-lane street. SID No. 347 provides no authority for the notion that such "overbuilding," even if it could accurately be so described, creates standing on the part of SID No. 347 when it seeks to enjoin the implementation of less restrictive zoning at a location other than Chicago Street. And, frankly, we fail to see the connection, for standing purposes, between having a wide and safe street inside the neighborhood and having a narrower street at a different loca-

tion, not in the residential neighborhood. What is important is whether changing the zoning on part of Greenfields Plaza causes special injury to SID No. 347—not the wisdom of requiring SID No. 347, at the time of development, to make Chicago Street three lanes.

Turning to the next basis for standing, the Nebraska Supreme Court, construing Neb. Rev. Stat. § 31-740 (Reissue 1998), has said that this legislative act imposes "an affirmative duty on the sanitary and improvement district for the maintenance and improvement of the roads within its boundaries." *SID No. 2 v. County of Stanton*, 252 Neb. 731, 735, 567 N.W.2d 115, 118 (1997). But, there is no evidentiary showing that increased traffic flow into Greenfields Plaza from the construction of a Burger King will increase traffic in Pacific Meadows II or III, at least not to the point of increasing SID No. 347's duty of street maintenance. In fact, the testimony of SID No. 347's own expert, Melaniphy, strongly suggests exactly the opposite conclusion. The increased traffic is in and out of Burger King, not in and out of the adjacent residential neighborhood, because at the simplest level, it is a "highway site" not a neighborhood site. We do not see that SID No. 347's duty to maintain streets within its boundaries, if affected at all, is affected to the point that there is special injury. The traffic consequences of the proposed rezoning do not give SID No. 347 a legally protected interest or right or potential for some special injury, apart from the general injury to the public of the City. Thus, SID No. 347 has no standing.

The only claim of standing by Dennis is that he lives on 160th Street, and as a result, he has concern for himself and his children because of increased traffic. But, as is true of SID No. 347, he has not proved that traffic in the neighborhood is reasonably likely to increase to the point that he is caused special damage. Given the authority that we have discussed in detail, and our conclusion considering the lack of standing on the part of SID No. 347, we need say no more about Dennis' claim to standing, except that if accepted, standing as a predicate to suit would become merely an illusion.

## CONCLUSION

We cannot agree with the district court's conclusion that the parties bringing this lawsuit to enjoin the enforcement of the rezoning ordinance had standing. The demurrer which raised the standing issue at the outset of the case should have been sustained as to both SID No. 347 and Dennis. But, in any event, at the close of the proof, it was completely clear that neither SID No. 347 nor Dennis had proved that they had suffered, or would suffer, the kind of special damage or injury necessary to give them the interest in the lawsuit so as to give them standing. In short, concern about the possibility of increased traffic, which is all that the evidence established, is not enough for standing. The trial court's conclusion that they had standing was clearly wrong. As a result, the petition should have been dismissed.

REVERSED AND DISMISSED.